Stephen J. Crimmins  (SC-2714)
Thomas V. Sjoblom    (TS-6555)
Keith A. O'Donnell   (KO-4201)

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
450 Fifth Street, N.W.
Washington, D.C.  20549
(202) 942-4744

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---

SECURITIES AND EXCHANGE COMMISSION,
          Plaintiff,

            v.

George Wallace Stewart,
Patrick J. Madden,
Allen B. Gottlieb,
Kenneth R. Lagonia,
Salim El Hage,
H.D. Inc.,
St. Barth Limited,
Eastland American Bank Limited,
Foreign Trade Bank International,
and Mecis Insurance and Reinsurance
Company

        Defendants,

          -and-

Cornel D. Plebani,
Americredit Commercial Corporation,
Law Offices of Gottlieb and
Associates, P.C., and
Finanzurich, Limited

       Relief Defendants.

---

**98 CIV. 2636**

98 CIV.

COMPLAINT

Plaintiff Securities and Exchange Commission alleges:

## SUMMARY

1.   This case involves fraud in the offer and sale of securities by the defendants. Since 1993, the defendants have offered and sold securities in the form of participations in investment programs purportedly to trade prime bank instruments, which were described variously as medium-term bank notes, stand-by letters of credit, and prime bank guarantees.  The defendants sold participations in the investment programs to at least three investors, and received at least $1.7 million.

2.   The defendants claimed that they operated a program that successfully bought and traded instruments issued by the world's largest banks, generating spectacular profits for investors at no risk.   The program and its promoters were portrayed as follows: Defendants George Wallace Stewart and Patrick Madden would locate investors, explaining the investment program to them.   Defendants Allen Gottlieb and Kenneth Lagonia would purportedly  arrange, for a fee, the line of credit necessary to trade the prime bank notes for the benefit of the investors.  Defendant Salim El Hage (acting on behalf of defendants Eastland American Bank Limited, Foreign Trade Bank, and Mecis Insurance and Reinsurance Company) would issue the credit line for a fee.   Once the line of credit was in place, Stewart, through two companies he controlled, defendants H.D. Inc. and St. Barth, would use the investors' funds to trade prime bank notes. The trading was to result in earnings for

2

investors of ten to fifty times their initial investments over periods of between two months and two years.

3.    The investment programs were scams, the instruments themselves bogus. Instead of using the money as promised, the defendants misappropriated the investors' funds for their own benefit.

4.    By engaging in such conduct, the defendants violated the antifraud provisions of both the Securities Act of 1933 and the Securities Exchange Act of 1934.   Unless enjoined by this Court, the defendants will likely continue to engage in such violations. The SEC accordingly seeks injunctions against future violations, disgorgement for which the defendants are jointly and severally liable, and civil money penalties from the defendants.   The SEC also seeks disgorgement from four relief defendants, who initially received some of the money unlawfully obtained by the defendants from investors and either hold or held the money in constructive trusts for the benefit of the investors.

## JURISDICTION

5.    This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d)(1), 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

6.    The defendants, directly or indirectly, made use of the mails, or the means or instrumentalities of interstate commerce, or

the means or instruments of transportation or communication in interstate commerce in connection with the acts, practices, or courses of conduct alleged herein.

## DEFENDANTS

7.    **George Wallace Stewart**, 55 years old, currently resides in Florida.   During the relevant period, Stewart created and controlled two corporations through which he operated the investment scheme, St. Barth Limited and H.D. Inc.

8.    **Patrick J. Madden**, 48 years old, is a Canadian citizen and alternatively resides in Canada and France.   Madden is Vice President of St. Barth Limited and is registered as a non-practicing attorney with the Alberta Law Society in Alberta, Canada.

9.    **Allen B. Gottlieb**, 54 years old, resides in Fort Lauderdale, Florida.   Gottlieb is an attorney licensed to practice in New York.

10.    **Kenneth R. Lagonia**, age unknown, resides in Bohemia, New York.   During the relevant period, Lagonia represented himself as the president of Americredit Commercial Corporation, a mortgage and finance company with its office in New York, New York.

11.    **Salim El Hage**, age unknown, was last known to reside in Paris, France.   El Hage claimed to have headed an umbrella financial organization called the Eastland Group, which included Eastland American Bank Limited, Foreign Trade Bank International

4

and Mecis Insurance and Reinsurance Company, for which El Hage was Chairman, President, and Chairman, respectively.

12.   **H.D. Inc.**, a New Jersey corporation, participated in the investment scheme by, among other things, receiving and disbursing investors' funds.

13.   **St. Barth Limited**, a Bahamian corporation, entered into an agreement with investors to trade prime bank instruments and share with investors the profits generated.   Bahamian authorities removed St. Barth from the list of registered companies in December of 1994.

14.   **Eastland   American   Bank   Limited**   ("Eastland"), incorporated in the Bahamas in June 1990, had its registration revoked in January 1994.   El Hage represented to an investor that Eastland was a bank capable of issuing the credit lines necessary to trade prime bank instruments.   Eastland was to receive $1.1 million of investors' funds.

15.   **Foreign Trade Bank International** ("FTB") was held out by El Hage to an investor as a bank controlled by El Hage and based in Beirut, Lebanon.   It obtained, or had pass through its bank account, at least $396,667 from at least one investor.   According to Lebanese authorities, FTB was liquidated in April 1994 and is no longer registered as a bank.

16.   **Mecis Insurance and Reinsurance Company** ("Mecis") was represented by the defendants as a company based in Beirut, Lebanon, with its Paris office run by El Hage.   El Hage represented

5

Mecis as part of the Eastland Group, which included Eastland and FTB.  He further represented that the Eastland Group had resources to establish the requisite lines of credit.  Mecis was to receive money from the scheme and was in a position to obtain money from FTB.

## RELIEF DEFENDANTS

17.  **Cornel D. Plebani**, age 50, resides in Phillisburg, New Jersey, and acted as a finder for the defendants, locating three investors.  He received at least $7,000 of investors' funds.

18.  **Americredit Commercial Corporation** was represented to investors as a New York corporation operated by Lagonia and Gottlieb.  It received, or had pass through its bank account, at least $350,000 of investors' funds.

19.  **Law Offices of Allen B. Gottlieb, P.C.** is a New York professional corporation, which is owned solely by Gottlieb.  It received, or had pass through its bank account,  at least $300,000 of investors' funds.

20.  **Finanzurich Limited** is a company incorporated in the Bahamas and owned jointly by Lagonia and Gottlieb.  It initially received, or had pass through its bank account, at least $350,000 in investors' funds.

6

## FRAUDULENT OFFERS AND SALES OF SECURITIES

### THE LONGO INVESTMENT

21.  In May 1993, Plebani, acting as a finder, introduced Stewart to Robert J. Longo. Thereafter, in a series of meetings, Stewart, at times accompanied by Madden, offered Longo various investment opportunities involving trading prime bank notes.

22.  Stewart promised that Longo would earn $50 million on a $1.1 million investment within one or two years.  Stewart not only stated that his profit projection was based on his past experience successfully trading stand-by letters of credit, but also represented the transactions as risk free.   Stewart described how he would use Longo's $1.1 million, combined with similar investments by others, to establish a $110 million line of credit, also known as a credit facility.  Stewart claimed that he would then use the line of credit to purchase, at discounts of 78 percent to 83 percent, letters of credit issued in denominations of $10 million, $25 million, and $100 million. Stewart claimed that he would then turn around and sell the discounted instruments at higher prices, making spectacular profits.  Stewart showed Longo documents purportedly representing pre-arranged contracts for the purchase and sale of letters of credit.

23.  At meetings with Longo, Madden echoed Stewart's statements regarding the proposed investments and stated that he and Stewart had in the past successfully traded prime bank

7

instruments.    Madden also represented that he was an expert regarding the procedures and protocols of trading prime bank instruments.

24.  Acting on Longo's behalf, Stewart executed a consulting agreement with Lagonia's purported Bahamian company, Americredit International.   Under this agreement, Americredit International, through Lagonia, was to assist in securing the credit lines necessary to trade the prime bank instruments.

25.  Subsequently, at a meeting held in Key West, Florida, on or about June 3, 1993, Stewart introduced Longo to Gottlieb and Lagonia. At the Key West meeting, Gottlieb and Lagonia represented that they were able to obtain the credit lines to trade prime bank instruments through their international banking contacts. Thereafter, Gottlieb agreed to establish for Longo a prime bank trading program, which included two credit lines, one for $100 million, the other for $10 million.   Longo signed two agreements prepared by Gottlieb, one for each line of credit.

26.  At the same time, on Gottlieb's instructions, Longo wired $1.275 million to Gottlieb's attorney trust account at Citibank in New York. Gottlieb assured Longo that the money would remain in the trust account until Gottlieb and Lagonia obtained the lines of credit necessary to trade prime bank instruments.

27.  In a series of telephone calls with Longo, Stewart and Gottlieb continued to confirm the viability of the prime bank

8

investment program. Stewart further represented that the first
trade would occur soon after the issuance of the credit lines.

28.   Soon thereafter, on or about June 10, 1993, along with
Gottlieb and Lagonia, Longo met in Paris, France, with El Hage, who
represented himself as the Chairman of Eastland American Bank
Limited.   El Hage told Longo that Eastland would establish the
credit lines.   El Hage showed Longo documents that purportedly
established the two stand-by letters of credit for trading
facilities at Eastland, one for $100 million, the other for $10
million.   The documents listed FTB on the letter head of the credit
lines and designated Mecis as the beneficiary of the prime bank
instruments and recipient of payments advanced by participating
banks in the form of purchase commitments for the instruments.   El
Hage, Gottlieb, and Stewart, by telephone from New Jersey, all
assured Longo that the Eastland credit lines would support the
promised prime bank instrument trading.   In making this assurance,
Gottlieb and El Hage specifically represented to Longo that, if
necessary, Eastland or its affiliates and correspondent banks,
including Mecis and FTB, would advance funds necessary to complete
the anticipated prime bank instrument trading.

29.   El Hage and Gottlieb also both told Longo that $1.1
million of his funds was the price Eastland would charge for the
credit line, with the balance of $175,000 used to pay the fees
and expenses of other parties involved in the program.   At the
end of the meeting, Longo executed El Hage's documents, then

9

authorized the release of his $1.275 million from Gottlieb's trust account, $1.1 million of which was to go to Eastland.

30.  Upon his return from Paris, Longo immediately learned from Stewart that no trading had commenced and that the Eastland credit lines were unsuitable for trading and, thus, no trading could occur.  Stewart continually assured Longo that he could deliver the promised profits.  But, instead the defendants misappropriated Longo's $1.275 million.

31.  Contrary to the agreement with Longo, Gottlieb initially disbursed the money, in part, as follows: 1) $396,667 went to an account of FTB; 2) $350,000 went to Finanzurich; 3) $150,000 went to an account of Gottlieb and Associates, P.C.; and 4) $25,000 went to an account of Americredit Commercial Corporation.  The ultimate disposition of the funds is currently unknown.

### THE MYERS/SCHWARTZ INVESTMENT

32.  Also during May 1993, at approximately the same time that the defendants were presenting the prime bank scheme to Longo, Plebani introduced Stewart to Theodore Myers and Robert Schwartz. Except for its cost and the size of the credit facility, the investment scheme presented to Myers and Schwartz was substantially the same as the one presented to Longo.  As with Longo, Stewart and Madden presented the investment program to Myers and Schwartz, with Stewart representing the investment as riskless.  Myers and Schwartz were told that the investment

10

involved trading in medium-term bank notes backed by a multi-million dollar credit facility. Madden illustrated the program by showing Myers and Schwartz a thick notebook purportedly containing examples of prime bank investments.

33. In meetings with Myers and Schwartz, Stewart discussed his purported prior successful experiences trading prime bank instruments. Neither Stewart nor Madden told Myers and Schwartz about the problems associated with the Longo investment program.

34. On or about July 7, 1993, Myers and Schwartz entered into a contract with St. Barth whereby St. Barth, through Stewart, would trade prime bank instruments, sharing the resulting profits with Myers and Schwartz. Together Myers and Schwartz invested $500,000 purportedly to acquire a $22 million credit line that promised a return of $5 million within two months.

35. Stewart had told Myers and Schwartz that through Gottlieb, Lagonia, and El Hage and El Hage's entities (in particular Eastland) Stewart would obtain a credit facility to trade prime bank instruments on Myers and Schwartz's behalf.

36. Stewart further provided documents to Myers and Schwartz in which Gottlieb represented that he would secure a $22 million letter of credit for the purchase of a $25 million prime bank instrument. The documents stated that the letter of credit and prime bank instruments were for the benefit of St. Barth in furtherance of its prime bank investment program.

11

37.   On or about July 6 and July 9, 1993, Myers and Schwartz together placed a total of $500,000 with Stewart who promised that H.D. Inc. would hold their money in escrow until the credit facility was established.

38.   Myers and Schwartz demanded the return of their money when they learned that no credit line was established and no prime bank instruments had been traded.   However, Myers and Schwartz's investment was not returned.

39.   Instead, approximately $325,000 of Myers and Schwartz's money was initially disbursed from H.D. Inc. to a bank account of Americredit Commercial Corporation and then subsequently transferred to Gottlieb's attorney trust account.   Of the remaining $175,000, $150,000 was initially sent to Gottlieb's attorney trust account and at least $7,000 was paid to Plebani as a finder's fee. The ultimate disposition of the investors' funds is currently unknown.

### FIRST CLAIM

### VIOLATIONS OF SECURITIES ACT SECTION 17(A)

### AND EXCHANGE ACT SECTION 10(B) AND RULE 10B-5

40.   Paragraphs 1 through 39 are hereby realleged and incorporated herein by reference.

41.   By engaging in the foregoing conduct, Stewart, Madden, Gottlieb, Lagonia, El Hage, H.D. Inc., St. Barth, Eastland, FTB, and Mecis have knowingly or recklessly engaged in an unlawful

12

scheme to mislead and defraud investors in connection with the offer and sale of securities.

42.    In marketing and selling the investment program to trade prime bank instruments, the defendants failed to disclose the following material facts, among others:

- Prime bank instruments are fictitious.
- No market existed to trade prime bank instruments.
- The credit lines themselves were artifices.
- None of the defendants had successfully traded prime bank instruments before.
- Some of the defendants had themselves lost money in similar schemes.

43.    By reason of the foregoing the defendants violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.


### SECOND CLAIM

### CONSTRUCTIVE TRUST AGAINST RELIEF DEFENDANTS

44.    Paragraphs 1 through 43 are hereby realleged and incorporated by reference herein.

45.    Based on the foregoing, relief defendants Cornel D. Plebani, Americredit Commercial Corporation, Law Offices of Gottlieb and Associates, and Finanzurich received investors' funds that were dissipated as a result of the unlawful conduct of the

13

defendants Stewart, Madden, Gottlieb, Lagonia, El Hage, H.D. Inc.,
St. Barth, Eastland, FTB, and Mecis.  Relief defendants have held
or still hold the investors' funds, but have transferred no assets
to investors and have no legitimate ownership interest in such
funds.  Relief defendants hold the investors' funds in constructive
trust for the benefit of the investors.

### PRAYER

**WHEREFORE**, plaintiff SEC respectfully requests that this
Court:

#### I.

Permanently enjoin defendants Stewart, Madden, Gottlieb,
Lagonia, El Hage, H.D. Inc., St. Barth, Eastland, FTB, and Mecis
from violating Section 17(a) of the Securities Act [15 U.S.C.
§§77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]
and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]

#### II.

Order the defendants to make an accounting of:

A.    any and all of their current assets, funds, or other
      properties held in their name, or for their direct or
      indirect  beneficial  interest,  or  over  which  they
      maintain  control,  wherever  situated,  stating  the
      location, value, and disposition of such asset, funds,
      and other property; and

14

B.      each account with any financial or brokerage institution maintained in their name or for their direct or indirect beneficial interest, or over which they maintain control, and the names and last known addresses of all bailees, debtors, and other persons and entities which have held or are holding any of their assets, funds or other properties, at any time from May 1, 1993 to the present.

### III.

Order defendants jointly and severally to disgorge any and all ill-gotten gains derived from the fraudulent conduct alleged herein, plus prejudgment interest thereon.

### IV.

Order defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

### V.

Order relief defendants to disgorge the funds that they hold in constructive trust for investors plus prejudgment interest thereon.

## VI.

Order further relief as the Court may deem just and equitable.

Respectfully submitted,

*Stephen J. Crimmins*

Stephen J. Crimmins (SC-2714)
Thomas V. Sjoblom
William R. Baker III
Kathleen M. Hamm
Lani M. Lee
Keith A. O'Donnell

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
450 Fifth Street, N.W.
Washington, D.C. 20549
(202) 942-4736

Washington, D.C.

Dated:

16