UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x

SECURITIES AND EXCHANGE COMMISSION,           :

                Plaintiff,           :

      - against -           :

GEORGE WALLACE STEWART, et al.,           :

             Defendants,           :

      - and -           :

CORNEL D. PLEBANI, et al.,           :

          Relief Defendants.   :

- - - - - - - - - - - - - - - - - - - - x     98 Civ. 2636 (LAP)

SECURITIES AND EXCHANGE COMMISSION,           :

Plaintiff-Petitioner-Judgment Creditor, :

      - against -           :

FIRST AMERICAN TITLE INSURANCE COMPANY, :

         Respondent-Garnishee,           :

ALLEN B. GOTTLIEB,           :

       Defendant-Judgment Debtor,           :

PHYLLIS J. GOTTLIEB, Individually and :
as Trustee of the Phyllis J. Gottlieb
Living Trust dated February 17, 2012, :

        Interested Person.           :

- - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF**
**PHYLLIS GOTTLIEB'S RENEWED MOTION TO RELEASE RESTRAINED FUNDS**

ALEXANDER E. EISEMANN AE5405
Counsel for Interested Party
  Phyllis Gottlieb
20 Vesey Street, Suite 400
New York, New York 10007
(212) 420-8300

TABLE OF CONTENTS

PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . 3

1.  Outright ownership . . . . . . . . . . . . . . . . . . . 4

2.  Tenancy by the Entireties. . . . . . . . . . . . . . . . 5

3.  Half Interest in the Marital Estate. . . . . . . . . . . 6

4.  Homestead. . . . . . . . . . . . . . . . . . . . . . . . 8

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . 13

A.  Restraining Notices and Turnover Actions under the CPLR.  13

B.  The Indisputable Evidence Establishes that
    the Aventura Lakes Home and the Proceeds of its
    Sale are Immune from Judgment Because Mrs. Gottlieb
    Owned it Outright or as a Tenant by the Entirety  . . .  16

C.  At the Very Least, Mrs. Gottlieb Would
    be Entitled to Half of the Sale Proceeds
    Because They are Part of The Marital Estate. . . . . . .  24

D.  Florida's Expansive Homestead Exemption
    Also Protects the Proceeds of the Aventura
    Lakes Home Sale from All Creditors . . . . . . . . . . .  28

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . 30

TABLE OF AUTHORITIES

CASES

Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d
Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . 35

Antuna v. Dawson, 459 So.2d 1114, 1116-17 (Fla. Dist. Ct. App.
1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Beal Bank, SSB v. Almand & Associates, 780 So. 2d 45, 52 (Fla.
2001) . . . . . . . . . . . . . . . . . . . . . . . . 27-29

Branch Banking & Trust Co. v. ARK Dev./Oceanview, LLC, 150 So. 3d
817, 821 (Fla. Dist. Ct. App. 2014) . . . . . . . . . . . 29

Brown v. Hanger, 368 So.2d 63, 64 (Fla. Dist. Ct. App. 1979).  30

Buckeye Ret. Co., LLC v. Nassau Land & Trading Co., 943 So. 2d
223, 224 (Fla. Dist. Ct. App. 2006) . . . . . . . . . . . 29

Cadle Co. v. Satrap, 302 A.D.2d 381, 754 N.Y.S.2d 354 (2d Dep't
2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Cruz v. TD Bank, 22 N.Y.3d 61, 979 N.Y.S.2d 257, 261 (2013) .  25

Dodson v. Nat'l Title Ins. Co., 159 Fla. 371, 31 So.2d 402, 404
(1947). . . . . . . . . . . . . . . . . . . . . . . . . . 30

Hart v. Atwood, 119 So. 116 (Fla. 1928) . . . . . . . . . . 29

Hunt v. Covington, 145 Fla. 706, 708, 200 So. 76, 77 (1941) . 29,
                                                              31

In re Sammut, 171 B.R. 411, 413 (Bankr. M.D. Fla. 1994) . . . 29

JW Oilfield Equip., LLC v. Commerzbank, AG, 764 F. Supp.2d 587,
591 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . 25, 26

Landau v. Vallen, 895 F. 2d 888, 896 (2d Cir. 1990) . . . . . 25

Miller v. Rosenthal, 510 So.2d 1127, 1128 (Fla. Dist. Ct. App.
1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Mitchell v. Lyons Prof'l Servs., 109 F. Supp. 3d 555 (E.D.N.Y.
2015) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Morris v. New York State Dep't of Taxation & Fin., 82 N.Y.2d 135,
603 N.Y.S.2d 807, 811 (1993). . . . . . . . . . . . . . . 35

Ohio Butterine Co. v. Hargrave, 84 So. 376 (Fla. 1920). . . . 29

<u>Orange Brevard Plumbing & Heating Co. v. La Croix</u>, 137 So.2d 201, 206 (Fla.1962). . . . . . . . . . . . . . . . . . . . . . . . . . 41

<u>Passalino v. Protective Grp. Sec.</u>, 886 So. 2d 295, 297 (Fla. Dist. Ct. App. 2004). . . . . . . . . . . . . . . . . . . . . . 30

<u>Rossano v. Britesmile, Inc.</u>, 919 So. 2d 551, 552 (Fla. Dist. Ct. App. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

<u>Shawzin v. Donald J. Sasser, P.A.</u>, 658 So.2d 1148 (Fla. 4th DCA 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

<u>Sheldon v. Waters</u>, 168 F.2d 483, 485 (5th Cir. 1948). . . . . 30

<u>Sloan v. Starbare II Partners, L.P.</u>, 256 A.D.2d 104, 105, 681 N.Y.S.2d 267, 268 (1st Dep't 1998). . . . . . . . . . . . . . . 38

<u>Stanley v. Powers</u>, 166 So. 843 (Fla. 1936). . . . . . . . . . 30

<u>Sun First Nat'l Bank of Orlando v. Gieger</u>, 402 So.2d 428 (Fla. 5th DCA 1981) . . . . . . . . . . . . . . . . . . . . . . . . . 41

<u>Suntrust Bank/Miami, N.A. v. Papadopolous</u>, 740 So.2d 594 (Fla. 3d DCA 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

<u>Thomas J. Konrad & Associates, Inc. v. McCoy</u>, 705 So. 2d 948, 949 (Fla. Dist. Ct. App. 1998). . . . . . . . . . . . . . . . . 33

<u>V.R.W., Inc. v. Klein</u>, 68 N.Y.2d 560, 563 (1986). . . . . . . 27, 2 8

<u>Valdivia v. Valdivia</u>, 593 So.2d 1190, 1192 (Fla. 3d DCA 1992). . . . . . . . . . . . . . . . . . . . . . . 32

<u>Viggiano v. Viggiano</u>,  136 A.D.2d 630, 523 N.Y.S.2d 874 (2d Dep't 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>Winters v. Parks</u>, 91 So.2d 649 (Fla. 1956). . . . . . . . . . 29

<u>OTHER AUTHORITIES</u>

Fla. Rev. Stat. § 61.075(1) . . . . . . . . . . . . . . . . . 36

Fla. Stat. Ann. § 61.075(6)(a)(2) (West 2015) . . . . . . . . 36

Fla. Stat. Ann. § 77.16 (West 2015) . . . . . . . . . . . . . 25

Fla. State § 55.10(1) . . . . . . . . . . . . . . . . . . . . 29

NY CPLR 5239. . . . . . . . . . . . . . . . . . . . . . . 25, 32

NY CPLR 5240. . . . . . . . . . . . . . . . . . . . . . . . . 2

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x

SECURITIES AND EXCHANGE COMMISSION,        :

                    Plaintiff,             :

          - against -                      :

GEORGE WALLACE STEWART, et al.,            :

                    Defendants,            :

          - and -                          :

CORNEL D. PLEBANI, et al.,                 :

                    Relief Defendants.     :

- - - - - - - - - - - - - - - - - - - - x    98 Civ. 2636 (LAP)

SECURITIES AND EXCHANGE COMMISSION,        :

Plaintiff-Petitioner-Judgment Creditor,    :

          - against -                      :

FIRST AMERICAN TITLE INSURANCE COMPANY,    :

                    Respondent-Garnishee,  :

ALLEN B. GOTTLIEB,                         :

          Defendant-Judgment Debtor,       :

PHYLLIS J. GOTTLIEB, Individually and      :
as Trustee of the Phyllis J. Gottlieb
Living Trust dated February 17, 2012,      :

                    Interested Person.     :

- - - - - - - - - - - - - - - - - - - - x
```

## MEMORANDUM OF LAW IN SUPPORT OF
## PHYLLIS GOTTLIEB'S RENEWED MOTION TO RELEASE RESTRAINED FUNDS

Interested Person Phyllis Gottlieb ("Mrs. Gottlieb"),

respectfully submits this memorandum of law in support of her

renewed motion to release the proceeds of the sale of the home

-1-

she owned in Aventura, Florida, which were originally restrained
by virtue of a notice filed by the Securities and Exchange
Commission (the "SEC") in 2015 and which were subsequently
deposited in this Court's registry.[1]

PROCEDURAL HISTORY

In this so-called "turnover" proceeding, the SEC seeks
to apply all the proceeds of the sale of Mrs. Gottlieb's home to
satisfy a judgment the SEC obtained against her husband, Allen.
To that end, on or about July 24, 2015, the SEC served a
restraining notice on the First American Title Insurance Company,
which was routinely in possession of the proceeds of the sale of
the home, as part of the closing process.  See SEC v. Stewart, et
al., 98 Civ. 2636, ECF Entry No. ("ECF #") 160; N.Y. Civ. Prac.
L.& R. ("CPLR") 5222(b).  On August 20, 2015, the SEC filed a
"turnover" motion in this Court, seeking an order directing First
American to turn over to it the funds that had been placed under
restraint (ECF #163).

On January 15, 2016, Mrs. Gottlieb filed a motion to
release the restrained funds, which was the predecessor to this

_____

[1]     The original notice of motion dated January 15, 2016
(ECF #186), recited that it was being supported by two
declarations--one executed by Phyllis J. Gottlieb (ECF #187) and
one by Alexander J. Alfano (ECF #188), and also by an affidavit
sworn to by Neil A. Milestone (ECF #189).  An amended notice of
motion dated February 10, 2016 (ECF #197), recited that it was
being supported by an amended declaration by Mrs. Gottlieb (ECF
#198, subsequently replaced by ECF #201), as well as by the
original Alfano declaration (ECF #188) and original Milestone
affidavit (ECF #189).  Given the passage of time and for the
Court's convenience, Mrs. Gottlieb is refiling these three items
to make clear which are offered in support of this renewed motion
and to place them in closer proximity to this memorandum on the
docket sheet.

renewed motion seeking the same relief.  See Securities and
Exchange Comm'n v. Stewart, et al., 98 Civ. 2636 (LAP) (ECF #186-
89).  As the motion was filed prior to any discovery, it sought
the preliminary release of only half the restrained funds.  The
matter was fully briefed by all parties and on April 14, 2016,
the Court resolved it by staying it "pending Mrs. Gottlieb's
appearance for a deposition, including full document production."
Order dated April 14, 2016, at 2 (ECF #220).

The five years since were taken up with litigation over
collateral issues, the complexity of privilege issues in the main
document production and obstacles stemming from the pandemic.
The Gottliebs themselves had no role, whatsoever, in causing any
the delays, which were caused by their counsel and issues beyond
anyone's control, such as the pandemic.[2]  See Eisemann Decl.
¶¶ 4-12.  The deposition of Mrs. Gottlieb (conducted by
interrogatories by agreement of the parties) and Mr. Gottlieb
(even though it wasn't required under the Court's order), as well
as the full document production are all now complete.  On that
basis, Mrs. Gottlieb respectfully renews her motion and seeks
release of all the funds.

SUMMARY OF ARGUMENT

In the original motion seeking the release of only half
the restrained funds, Mrs. Gottlieb's strategy was to provide a
basis to release some of the funds if the Court were disinclined

---

[2]     The full procedural history of the case in the five
years since the Court's April 14, 2016, decision is set forth in
detail in the accompanying declaration of Alexander E. Eisemann,
executed April 12, 2021 ("Eisemann Decl.").

to accept the arguments for release of all of them without first giving the SEC any opportunity to conduct discovery (generally disfavored in turnover actions).

Now that discovery is complete, Mrs. Gottlieb seeks the release of all the funds on all three theories, essentially throwing down the gauntlet to the SEC to produce any evidence it has developed during discovery (there is none) to substantiate its nebulous claim that Mrs. Gottlieb was the improper "alter ego" of her husband.  Essentially, it is a motion for partial summary judgment on all the claims except the powerful homestead claim discussed below, which requires a full trial to resolve.

If, as Mrs. Gottlieb submits, the SEC can't point to a material dispute of fact after it has had the benefit of the discovery it sought to try to develop one, the funds can no longer be withheld from her, as they have wrongfully been for more than five years.  As is demonstrated below, they all must be released pursuant to this dispositive motion.  It contains the same argument about why Mrs. Gottlieb would never, even after a full trial, be entitled to anything less than half and makes the same fallback argument that half must be released, at the very least.  That is not what she seeks, however.  She respectfully submits that the Court must order the release of all the funds.

There are four entirely distinct reasons why the SEC's effort to obtain the funds in the registry was always doomed to fail and why that hasn't changed with the benefit of discovery.

1) <u>Outright ownership</u>.  First, Mrs. Gottlieb owned the Aventura Lakes property outright, in her own name, purchased with

funds derived from the sale of other homes she had similarly
owned outright.  She owned those other homes because she and Mr.
Gottlieb had purchased them jointly during the course of their
marriage (in the 1980's) but Mr. Gottlieb quitclaimed all his
interests in them to Mrs. Gottlieb in 1994.  That was a full four
years before the SEC filed the action that ultimately led to the
judgment against Mr. Gottlieb, and nine years prior to the 2003
resulting judgment (see ECF #85).  Simply put, Mr. Gottlieb has
no legally-cognizable and attachable interest in the proceeds of
the sale of Mrs. Gottlieb's Aventura Lakes property; therefore,
the SEC cannot obtain the turnover of any portion of them.

　　　　2) Tenancy by the Entireties.  Second, even if Mr.
Gottlieb hadn't ever relinquished his interests in the Aventura
Lakes or any of the predecessor homes--or even if he somehow
reacquired them by virtue of the SEC's superficial and
unsustainable argument that Mrs. Gottlieb was acting as his
"alter ego"--the SEC still cannot apply any of the sale proceeds
to the judgment against him.  Florida law, which controls and is
discussed fully below, presumes that spouses who jointly hold
title to real estate hold it as "tenants by the entireties" and
provides that no portion of property so held can be used to
satisfy a judgment against only one spouse.

　　　　In other words, even if Mr. Gottlieb somehow did not
validly relinquish his half of the tenancy by the entireties to
Mrs. Gottlieb, the sale proceeds would still be fully immune from
the SEC's judgment because the purportedly invalid transfer to

Mrs. Gottlieb would be unwound to the point that the home would revert to one held jointly in the joint-tenant capacity by both of the Gottliebs.  If that is deemed to be the case, no judgment against only Mr. Gottlieb could be enforced against the sale proceeds.

        3) <u>Half Interest in the Marital Estate</u>.  Third, even if the SEC convinces the Court, with its mumbo-jumbo reasoning, that Mr. Gottlieb nevertheless had an attachable interest in the Aventura Lakes home, and also somehow convinces it that Mr. Gottlieb lost the protection his tenancy by the entireties provides to his wife and him, it would be hard pressed to argue that his interest would be anything more than fifty percent. After all, the home was acquired during the Gottliebs' marriage and, assuming for the sake of argument that they did not share its ownership as tenants by the entireties, they each had a one-half ownership interest because the home and its sale proceeds were part of their marital estate.

        Given that, under Florida law (and New York law, for that matter) Mrs. Gottlieb would have at least a half interest in the restrained funds.  Thus, even if the Court decided not to release all the funds in the registry for some reason, it should in all good conscience release half and hold only what it believes is Mr. Gottlieb's maximum possible interest until trial. The SEC will never be able to overcome Mrs. Gottlieb's interest of at least fifty percent and so there is no reason to withhold her share of the funds under that theory from her and her

disabled child.  That would be not only legally unsound but
needlessly cruel.

No matter what arguments it raises to try to find some
interest in Mr. Gottlieb in the Aventura Lakes house and
restrained sale proceeds, the SEC could not, by any stretch of
the imagination, try to argue that Mrs. Gottlieb had no interest
whatsoever in them.  It would be absurd to argue that she could
not lay claim to any fraction of the home's value, not even a
measly one percent--because that would translate to Mr. Gottlieb
owning an even more absurd ninety-nine percent.  Mrs. Gottlieb
respectfully submits that the Court's analysis of the parties
respective interests should be conducted with that immutable fact
in mind.

The reality is that the SEC won't ever be able
completely to extinguish Mrs. Gottlieb's claim to whatever
percentage of the home's purchase the SEC will ultimately have to
acknowledge was made with marital assets or take her equity in
the quitclaimed properties.  To deny the immediate release of
even that absurdly tiny percentage, Mrs. Gottlieb submits, the
Court would have to torture the most basic property doctrines to
reach an entirely unsupportable conclusion.

Of course, Mrs. Gottlieb isn't seeking the release of
only one percent.  She makes the point only to bring into sharp
relief the undeniable fact that she is entitled to some, if not
all, of the proceeds at this stage.  There is a percentage
ownership that the SEC can never overcome no matter what facts it

-7-

tries to press in opposition to this motion.  Mrs. Gottlieb respectfully submits it will never be below fifty percent.

4) <u>Homestead</u>.  There is a fourth basis upon which all the funds will eventually have to be released, the expansive protection provided by Florida's constitutional homestead exemption.  To base a decision on it, the Court will have to make a finding that Mrs. Gottlieb was a Florida resident during the applicable time period and that she intended to invest the sale proceeds in a new residence.  The SEC is likely to claim a material issue of fact about that, at least with respect to the Florida-residency requirement.

Since Mr. and Mrs. Gottlieb live together, if she is entitled to the homestead exemption, so too is he.  Thus, no matter how the Court may otherwise allocate a percentage of ownership to Mr. Gottlieb, the homestead exemption will trump any claim that the SEC might be able to argue this his share belongs to it.  If the Gottliebs prevail on their homestead claim, it will make the other arguments by the SEC moot.  If this were a post-trial brief, Mrs. Gottlieb would marshal the significant evidence demonstrating that, under Florida law, she was a Florida resident at the time of the sale.  But it is not and if the Court denies relief of all the funds now, a trial will become necessary on the homestead claim.  By agreement with the SEC, that will have to be a jury trial with respect to Mrs. Gottlieb's claims. <u>See</u> <u>infra</u> n.7.

Although they believe they will prevail on the
homestead claim should this case proceed to trial, a trial on
that issue would be a waste of time because the SEC will never
defeat the indisputable argument, one free from any factual
disputes, that the Gottliebs were tenants by the entireties.
While the homestead claim, cannot be resolved short of a trial,
forcing one on that issue when the tenancy-by-the-entireties
argument eliminates the need to do that would create a needless
burden on the Court's and the parties' resources.  Accordingly,
Mrs. Gottlieb submits, no trial is required to determine what
should happen to the funds in the registry, something that can
and should be resolved now with this dispositive motion.

<u>FACTS</u>

In 1994, Mr. and Mrs. Gottlieb jointly owned two homes
in Florida, which they had acquired during their marriage.  <u>See</u>
Amended Declaration of Phyllis Jean Gottlieb, executed January
10, 2016, ¶¶ 9-11, 15 ("Gottlieb Decl. II").  Two years' earlier,
Mrs. Gottlieb had given birth to the couple's son, Jesse who was
profoundly affected by a serious case of Down Syndrome.  <u>Id</u>.
¶ 12.  Doctors told the couple that for the rest of his life,
Jesse would never be able to care for himself and that has turned
out to be true.  <u>Id</u>.

After a health scare for Mr. Gottlieb in 1994, the
couple decided to take prudent steps to protect the family's
assets for Mrs. Gottlieb, the couple's son, Jesse, and a second
child Mrs. Gottlieb was expecting.  <u>Id</u>. ¶¶ 13-15.  To do that,

Mr. Gottlieb quitclaimed his interest in both homes to Mrs. Gottlieb. Id. ¶ 15. Mrs. Gottlieb later sold both properties and the funds derived from the sale of these two homes were eventually used to purchase a home in Aventura Lakes, Florida. Id. ¶ 16.

The Aventura Lakes home was initially purchased by the "Cherubs Trust," an entity that had been established years earlier for the benefit of the Gottlieb's children, using funds that had come from the sale of other homes that had been held solely in Mrs. Gottlieb's name dating back to the 1994 quitclaims. See id. ¶ 16. Aside from a bald, conclusory claim in its memorandum in support of the request for a turnover of the restrained funds--that, generally, anything and everything Mrs. Gottlieb and the various trusts did with respect to purchasing and selling homes was merely as Mr. Gottlieb's nominee[3]--the SEC has not alleged that there was anything fraudulent about the initial purchase by the Cherubs Trust.

---

[3]    The SEC writes:

   In this matter, there is ample evidence that the Cherubs Trust (the entity who originally purchased the property), Phyllis Gottlieb (who received the Aventura Property from the Cherubs Trust and then conveyed it to the Trust), and the Trust <u>were all acting as the nominee and alter ego of Allen Gottlieb</u>, who had them take title for the sole and express purpose of shielding the asset from his creditors, including the SEC.

SEC Mem. in Support of Turnover Order, dated August 20, 2015 ("SEC Turnover Mem."), at 15 (emphasis added).

Nor does the SEC make any specific allegations of wrongdoing about a transfer two years later from the Cherubs Trust to Mrs. Gottlieb in her name alone.  <u>See</u> <u>id</u>. ¶ 16.  That transfer was effectuated simply to facilitate the anticipated sale of the Aventura Lakes home.  <u>See</u> SEC Turnover Mem. at 12-13 (summarizing deposition testimony by Allen Gottlieb on this issue).

Instead, the SEC focused its attention on what Mrs. Gottlieb did next, which it tries to portray as malevolent but which was actually nothing more than garden-variety estate planning.  Specifically, in 2012, on the advice of the family's lawyer, Neil Milestone, Mrs. Gottlieb created an estate-planning, trust called the "Phyllis J. Gottlieb Living Trust."  Gottlieb Decl. II ¶ 17; <u>See</u> SEC Turnover Mem. at 12-16; Affidavit of Neil Milestone, sworn to on October 6, 2015, ¶¶ 3, 7, 8, 11 ("Milestone Aff.").  As Mr. Milestone explains, the "residual defeasible interest" he created for Mrs Gottlieb's Aventura Lakes property in this trust was an utterly unremarkable event, something he says any estate-planning lawyer would recognize.  <u>See</u> Milestone Aff. ¶¶ 6, 10.

All that Mr. Milestone accomplished by creating this trust for Mrs. Gottlieb was to establish what would happen to the home if and when she died.  Instead of needing to go through probate, the house would simply pass to a trust (in which Mr. Gottlieb had no interest).  <u>Id</u>. ¶¶ 3, 7, 8, 11.  The ownership of the house did not change by this estate-planning step.  It

-11-

remained solely in Mrs. Gottlieb's name.  Mr. Gottlieb never had
any interest in the home and he did not acquire any interest in
the residuary trust Mr. Milestone created through his estate
planning.  Id. ¶ 5.  Far from creating or evincing any type of
interest of Mr. Gottlieb in the home, the steps Mr. Milestone
took in 2012 guaranteed that Mr. Gottlieb would never, even after
Mrs. Gottlieb's passing, be able to lay claim to the house or its
sale proceeds.

It has been over five years since Mr. Milestone
provided his sworn statement about what he intended by creating
the 2012 trust and what its legal effect was.  The SEC has never
shown any effort to refute that, which should be its first
priority.  If it has an expert who is willing to challenge Mr.
Milestone's opinions and conclusions now, let it produce a
counter affidavit or declaration.  Mrs. Gottlieb submits that no
one should hold their breath for that and that absence of another
legal opinion should really end the discussion.

In any event, two years later, in 2014, Mrs. Gottlieb
found a buyer for the Aventura Lakes property, the Brombergs.
Gottlieb Decl. II ¶ 19.  Backup buyers, the Cohens, filed an
action demanding that the house be sold to them.  Id. ¶ 21.  The
ensuing litigation between the two prospective buyers lasted for
more than a year and caused Mrs. Gottlieb to lose another home in
Ocala, Florida, which she had contracted to purchase.  Id. ¶¶ 21,
23.  She had planned to reside in the Ocala house with her
husband and two children and still intends to reside with them in
Florida by purchasing another home when the proceeds of the sale

-12-

of the Aventura Lakes home are released from the Court's registry.  Id. ¶¶ 20-23, 26-32, 38-39; see id. ¶¶ 32-36 (providing other evidence of intent to remain residents of Florida).

At the end of July 2015, Mrs. Gottlieb finally sold the home to the Cohens.  Id. ¶¶ 24-25.  On July 27, 2015, one day before an erroneously-placed IRS lien would be lifted,[4] the SEC stepped in and filed its own restraining notice.  See SEC v. Stewart, et al., 98 Civ. 2636, ECF Entry No. 160.  Unlike the erroneously-filed IRS lien, the SEC's restraining notice did not threaten the sale to the Cohens.  Nevertheless, it did scuttle Mrs. Gottlieb's plan to use the sale proceeds to purchase any other residence in Florida.  Gottlieb Decl. II ¶ 29.

DISCUSSION

A.   Restraining Notices and Turnover Actions under the CPLR

New York's CPLR governs the use of enforcement devices such as the SEC's notice of restraint employed here and turnover processes, which is what the SEC filed shortly after serving the notice. Under the CPLR, the Court had the authority to modify the

---

[4]     Three months prior to the sale, the Internal Revenue Service filed a tax lien against the home, which threatened the sale.  Gottlieb II Decl.  ¶¶ 24-25; see Alfano Decl. ¶ 2 & Exh. A.  It was a baseless lien, however, and Mrs. Gottlieb retained a lawyer to clear it up,  See Gottlieb Decl. II ¶ 24.  It was withdrawn on July 27, 2015, and the IRS sent a letter the same day apologizing for having filed it in error.  Alfano Decl. ¶¶ 3-4 & Exh. B & C.  The IRS subsequently stated that it had no interest in the restrained funds.  See Defendant First American Title Insurance Company's Response to Plaintiff's Motion for Partial Release of Funds, dated January 29, 2016 ¶ 10 ("The IRS has advised First American that it is not asserting a claim against the monies.").

-13-

restraining notice, as Mrs. Gottlieb asked it to do in the predecessor motion to release half the restrained funds.  <u>See</u> CPLR 5239,[5] 5240.[6]  Now that the funds are in the Court's registry, of course, the Court has the inherent authority to order their release.  <u>See</u>, <u>e.g.</u>, <u>Landau v. Vallen</u>, 895 F. 2d 888, 896 (2d Cir. 1990).  Mrs. Gottlieb has standing to seek release of the funds because she has been named as an "interested person" in this litigation.  <u>See</u> CPLR §§ 5239, 5240; <u>Cruz v. TD Bank</u>, 22 N.Y.3d 61, 979 N.Y.S.2d 257, 261 (2013); <u>Viggiano v. Viggiano</u>, 136 A.D.2d 630, 523 N.Y.S.2d 874 (2d Dep't 1988).

A turnover proceeding is typically initiated by filing a "Special Proceeding" in New York State court, a process that is supposed to be more akin to a motion than a plenary action and, accordingly, is supposed to be decided expeditiously.  <u>See JW</u>

---

[5]    CPLR 5239 provides, in pertinent part:

Prior to the application of property or debt by a sheriff or receiver to the satisfaction of a judgment, any interested person may commence a special proceeding against the judgment creditor or other person with whom a dispute exists to determine rights in the property or debt. . . .  The court may vacate the execution or order, void the levy, direct the disposition of the property or debt, or direct that damages be awarded.

<u>Id</u>.  Florida provides a similar mechanism for parties claiming an interest to obtain relief.  <u>See</u> Fla. Stat. Ann. § 77.16 (West 2015).

[6]    CPLR 5240 provides, in pertinent part:

<u>Modification or protective order; supervision of enforcement</u>.  The court may at any time, on its own initiative or the motion of any interested person, and upon such notice as it may require, make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure.

-14-

<u>Oilfield Equip., LLC v. Commerzbank, AG</u>, 764 F. Supp.2d 587, 591 (S.D.N.Y. 2011) (Castel, J.) ("A special proceeding is a civil judicial proceeding in which a right can be established or an obligation enforced in summary fashion.  Like an action, it ends in a judgment, but the procedure is similar to that on a motion. Speed, economy and efficiency are the hallmarks of this procedure." (quoting Alexander, CPLR 401 Practice Commentaries, Comment C401:1 (McKinney's 2010) (internal citations omitted)).

As the court observed when it entertained a similar state turnover proceeding in <u>Mitchell v. Lyons Prof'l Servs.</u>, 109 F. Supp. 3d 555 (E.D.N.Y. 2015):

> The action is commenced by a notice of petition and supporting affidavits and other documentary proof, and the opposition will likewise contain evidence. <u>Discovery is not generally permitted</u> and the matter is determined on the written record, without live testimony, consistent with the goal of expedited disposition--"[s]peed, economy and efficiency are the hallmarks of this procedure."

<u>Mitchell v. Lyons Prof'l Servs.</u>, 109 F. Supp. 3d 555, 563 (E.D.N.Y. 2015) (emphasis added) (quoting <u>JW Oilfield Equip</u>, 764 F. Supp.2d at 591.[7]

---

[7]    Despite the general disfavoring of testimony, the SEC agrees that if the funds in the registry are not released pursuant to a dispositive motion, Mrs. Gottlieb will be entitled to a jury trial on all of her claims.  In a typical turnover action, the entity served with a restraining notice is alleged merely to be holding property belonging to a judgment debtor. The entity served has no independent claim to it.  In this case, Mrs. Gottlieb does claim an interest, so she is entitled under the CPLR (and general due-process principles) to a jury trial before she can be stripped of property she claims she owns.  As a judgment debtor, Mr. Gottlieb is not entitled to a jury trial to resolve his disputed homestead claim but there will still need to be a bench trial on that.  Again, if funds are released now, there will be no need for a trial on Mr. Gottlieb's homestead claim or, of course, any of Mrs. Gottlieb's claims.

Despite that authority for dispensing with discovery, the Gottliebs raised no objection to the Court giving the SEC all the tools it sought to try to substantiate the assertions the Gottliebs believed were baseless and ultimately unsupportable. They have suffered, most notably Mrs. Gottlieb and her profoundly disabled child, while the SEC has tried to prove what it originally baldly and illogically claimed.

The SEC has scoured the public record, the Gottlieb's own records, Mr. Milestone's records and has questioned both Gottliebs--a second time for Mr. Gottlieb.  If it is going to make a factual case, now is the time.  If it fails, as Mrs. Gottlieb submits it will, it is time for this regrettable episode in her life and that of her disabled child to end and for their rights to be fully restored by an immediate release of her funds.

B.   The Indisputable Evidence Establishes that
     the Aventura Lakes Home and the Proceeds of its
     Sale are Immune from Judgment Because Mrs. Gottlieb
     Owned it Outright or as a Tenant by the Entirety

In both Florida and New York, a "tenancy by the entirety" is a form of real property ownership which is available only to married couples who have acquired real property together. See Beal Bank, SSB v. Almand & Associates, 780 So. 2d 45, 52 (Fla. 2001); V.R.W., Inc. v. Klein, 68 N.Y.2d 560, 563, 503 N.E.2d 496, 498 (1986).  "At common law, husband and wife were deemed a single legal entity, and a conveyance of property to both created an indivisible interest so that both parties were deemed seized of the whole." V.R.W., Inc. 68 N.Y.2d at 563 (1986); accord Beal Bank, 780 So. 2d at 52 n.7 (Fla. 2001).  The

-16-

concept of an indivisible interest remains today.  Thus, in
Florida:

> Property held as a tenancy by the entireties possesses
> six characteristics:  (1) unity of possession (joint
> ownership and control); (2) unity of interest (the
> interests in the account must be identical); (3) unity
> of title (the interests must have originated in the
> same instrument); (4) unity of time (the interests must
> have commenced simultaneously); (5) survivorship; and
> (6) unity of marriage (the parties must be married at
> the time the property became titled in their joint
> names). Because of the sixth characteristic--unity of
> marriage--a tenancy by the entireties is a form of
> ownership unique to married couples.

Beal Bank, 780 So. 2d at 52 (footnotes and internal citations
omitted).  "[I]n real property, intent to hold the property as a
tenancy by the entireties is presumed."  Id. at 55.

        The Gottliebs purchased two homes in Florida early in
their marriage--one in Key West and one in Fort Lauderdale.
Gottlieb Decl. II ¶¶ 10-11.  As in any typical purchase in the
names of a husband and wife, both of these homes were held by the
Gottliebs as tenants in the entireties.  Indeed, Mrs. Gottlieb
confirms in her accompanying declaration that she and her husband
intended to own those two properties as tenants in the
entireties.  Id. ¶ 11.  Their joint ownership also met all six of
the characteristics described above and fell within the
presumption that real estate jointly held by husbands and wives
are held in that capacity.

        It is well settled in Florida that a judgment against
one spouse is not enforceable against property owned by two
spouses as tenants by the entirety. See In re Sammut, 171 B.R.
411, 413 (Bankr. M.D. Fla. 1994) ("The recording of a certified

copy of the judgment therefore created a lien only on the former
husband's interest in the property. § 55.10(1), Fla. Stat.  It
did not affect the [wife's] undivided one half interest in the
property because the judgment was against only the former
husband."); Beal Bank, 780 So.2d at 53 (Fla. 2001) ("when
property is held as a tenancy by the entireties, only the
creditors of both the husband and wife, jointly, may attach the
tenancy by the entireties property; the property is not divisible
on behalf of one spouse alone, and therefore it cannot be reached
to satisfy the obligation of only one spouse"); Winters v. Parks,
91 So.2d 649 (Fla. 1956) ("Aside from unity of control, possibly
the most important incidents of a tenancy by the entirety are
that the survivor of the marriage, whether husband or wife, is
entitled to the whole estate and that any property so held is not
subject to execution to satisfy the debts of either of the
parties individually."); Hunt v. Covington, 145 Fla. 706, 708,
200 So. 76, 77 (1941) ("No persons except the husband and wife
have a present interest in an estate by the entireties . . . .
It is not subject to execution for the debt of the husband.");
Hart v. Atwood, 119 So. 116 (Fla. 1928) (same); Ohio Butterine
Co. v. Hargrave, 84 So. 376 (Fla. 1920) (same); Branch Banking &
Trust Co. v. ARK Dev./Oceanview, LLC, 150 So. 3d 817, 821 (Fla.
Dist. Ct. App. 2014) (same); Buckeye Ret. Co., LLC v. Nassau Land
& Trading Co., 943 So. 2d 223, 224 (Fla. Dist. Ct. App. 2006)
(same, quoting Beal Bank); Antuna v. Dawson, 459 So.2d 1114,
1116-17 (Fla. Dist. Ct. App. 1984) (Funds owned by a husband and

-18-

wife as tenants by the entireties are "beyond the reach of a
creditor of either one of the tenants. Such funds are immune from
garnishment except where the debt was incurred by both
spouses.").  "That situation must be distinguished from one
involving a judgment entered against both husband and wife.  Such
a judgment is enforceable against nonhomestead property held by
the entirety."  Stanley v. Powers, 166 So. 843 (Fla. 1936).

The proceeds of a sale of real property held as tenants
in the entireties are themselves deemed to be property held as
tenants in the entireties.  Passalino v. Protective Grp. Sec.,
886 So. 2d 295, 297 (Fla. Dist. Ct. App. 2004) ("The proceeds
from the sale . . . of tenancy by the entireties property are
also held as a tenancy by the entireties and are owned in total
by both the husband and the wife."); accord Dodson v. Nat'l Title
Ins. Co., 159 Fla. 371, 31 So.2d 402, 404 (1947); Miller v.
Rosenthal, 510 So.2d 1127, 1128 (Fla. Dist. Ct. App. 1987); Brown
v. Hanger, 368 So.2d 63, 64 (Fla. Dist. Ct. App. 1979); Sheldon
v. Waters, 168 F.2d 483, 485 (5th Cir. 1948).

In addition, there was nothing improper about Mr.
Gottlieb quitclaiming his interest in the two homes he had owned
with Mrs. Gottlieb to her in 1994.  Under Florida law, a spouse
who owns property jointly with the other spouse as tenants in the
entireties may transfer all his or her right, title and interest
to the other spouse to create a fee simple interest in the other
spouse.  Hunt, 145 Fla. at 708, 200 So. at 77.  Such a transfer
extinguishes all the interest the transferring spouse has in such
property.  Id.  Mr. Gottlieb's quitclaiming of his interests in

-19-

the Key West and Fort Lauderdale homes in 1994 effected just such a transfer of his interests in both homes to Mrs. Gottlieb, who then owned each of them in fee simple.

The SEC cannot claim and, indeed, has not even attempted to argue that these transfers were intended to hinder it as a creditor or potential creditor for two reasons.  First, and most obviously, the quitclaim transfers occurred four years prior to the filing of the lawsuit that underlies the SEC's judgment against Mr. Gottlieb, which itself wasn't entered until five more years.  See SEC v. Stewart, et al., 98 Civ. 2636, ECF Entry No. 1 (showing April 14, 1998, filing of summons and complaint in this action).  It would be impossible to argue that Mrs. Gottlieb was helping Mr. Gottlieb hinder the SEC's ability to collect on a future judgment stemming from a lawsuit that wouldn't be filed against him for another four years.  Second, there would have been no logical reason to try to make any type of nefarious transfer because under Florida law, there was already in place the most effective way to protect real property owned jointly by a husband and wife from the creditors of one of the spouses:  leaving both names on a deed as tenants by the entireties.  By doing nothing, the Gottliebs would have had the greatest protection the law allows because a judgment against one cannot be satisfied from the jointly-held real property.

Thus, had Mrs. Gottlieb simply held onto these two houses through 2015 and sold them, rather than the Aventura Lakes property that year, the SEC could not have filed a restraining notice against the proceeds of those sales without,

unquestionably, facing sanctions and/or an award of attorney's
fees.  <u>See</u> Fed. R. Civ. P. 11; <u>see also</u> CPLR 2239 ("If the court
determines that any claim asserted was fraudulent, it may require
the claimant to pay to any party adversely affected thereby the
reasonable expenses incurred by such party in the proceeding,
including reasonable attorneys' fees, and any other damages
suffered by reason of the claim.").  Since she used the proceeds
of her solely-owned houses to purchase the Aventura Lakes
property, <u>see</u> Gottlieb II Decl. ¶ 16--a fact the SEC has no basis
to challenge--that house and its sale proceeds were and are
solely owned by Mrs. Gottlieb and the restrained proceeds cannot
be used to satisfy the SEC's judgment against her husband.

     In Florida, "[t]he law is clear that a debtor may not
transfer property owned by himself, individually, to himself and
his wife as tenants by the entireties if such a transfer will
defraud creditors by putting that property beyond the creditors'
reach."  <u>Valdivia v. Valdivia</u>, 593 So.2d 1190, 1192 (Fla. 3d DCA
1992) (quoted in <u>Thomas J. Konrad & Associates, Inc. v. McCoy</u>,
705 So. 2d 948, 949 (Fla. Dist. Ct. App. 1998).  Nevertheless, if
the SEC somehow tried to argue that Mr. Gottlieb's quitclaims in
1994 were fraudulent conveyances designed to hinder its ability
to collect on a judgment it might obtain in a future lawsuit,
that effort would also be destined to fail.

     The judicial remedy for a fraudulent conveyance is to
undo it.  If that were done here, it would simply restore Mr.
Gottlieb along with his wife to the status of joint tenants by
the entirety.  The proceeds of the eventual sale of the Key West

and Fort Lauderdale houses would themselves be held as tenants in the entirety and the Aventura House would, despite being purchased in Mrs. Gottlieb's name alone, continue to be held as tenants by the entirety, assuming all the transactions along the way were similarly undone and restructured to be joint sales and purchases.  The net result would be that the sale proceeds would also be absolutely immune to attachment or available to satisfy the judgment against Mr. Gottlieb.

Of course, for this reason, there is no real possibility of the SEC trying to argue that transactions occurring four years before it filed its lawsuit against Mr. Gottlieb should be set aside.  Since the event it needs to suggest was fraudulent or designed to hinder its ability to collect on its judgment has to post-date the judgment (or at least the underlying lawsuit), it picks an otherwise trivial and insignificant event in 2012.

Thus, it takes a routine estate-planning step by Mrs. Gottlieb on the advice of her lawyer and adorns it with the empty and bald hyperbole that Mrs. Gottlieb was acting as her husband's "alter ego."[8]  From that entirely artificial construct, it draws the nonsensical conclusion that it is entitled to all of the proceeds of the later sale of that home.  As Mrs. Gottlieb's estate-planning lawyer, Neil Milestone, explains in his accompanying affidavit, creating the contingent trust ownership

---

[8]     As noted above, Mrs. Gottlieb's estate-planning lawyer set up a trust and created a contingent interest in it so it would acquire title of the Aventura Lakes home upon her death without having to go through probate.

-22-

did not raise Mr. Gottlieb's interest from what it was, zero, to anything above zero.  <u>See</u> Milestone Aff. ¶¶ 4, 5, 12.  Thus, the four corners of the underlying documentation establish that Mr. Gottlieb's ownership interest in the Aventura Lakes property started out at zero percent and ended up at the same figure.

Given that, the SEC has never suggested or offered any support for, and will never be able to support, its superficial suggestion that the creation of a contingent interest in a trust in 2012 was designed to hinder its ability to satisfy its judgment against Mr. Gottlieb.  In the corporate context, the Second Circuit has examined New York law on this issue and observed that an individual's control over a corporation is not sufficient, by itself, to sustain a claim that the corporation was the alter ego of the individual.

> New York law requires the party seeking to pierce a corporate veil to make a two-part showing: (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.  "While complete domination of the corporation is the key to piercing the corporate veil, . . . such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward [the party seeking piercing] is required."

<u>Am. Fuel Corp. v. Utah Energy Dev. Co.</u>, 122 F.3d 130, 134 (2d Cir. 1997) (quoting <u>Morris v. New York State Dep't of Taxation & Fin.</u>, 82 N.Y.2d 135, 603 N.Y.S.2d 807, 811 (1993)) (other citations omitted).

Far beyond its conclusory and unsupported assertion that Mr. Gottlieb demonstrated dominion and control over Mrs. Gottlieb, the SEC would have to demonstrate that the creation of

-23-

the contingent interest in a trust in 2012 was intended to defraud it as a creditor by hindering its ability to collect on the judgment against Mr. Gottlieb.  Given the realities about what the trust actually accomplished, the SEC could never hope that the Court would adopt its facially-absurd claim that it hindered its ability to do anything.

C.   At the Very Least, Mrs. Gottlieb Would
     be Entitled to Half of the Sale Proceeds
     Because They are Part of The Marital Estate

Yet, even assuming, arguendo, the SEC succeeds in demonstrating that Mr. Gottlieb had an interest in the Aventura Lakes house all along or that, somehow, he bizarrely reacquired one through the process of Mrs. Gottlieb creating a contingent interest in a trust (in which he had no interest) in 2012, it could never prove that Mrs. Gottlieb ever relinquished her own interest.  At best, it could hope to prove that both of the Gottliebs had an interest in the home and the proceeds of its sale.

It would be difficult to imagine any scenario under which Mrs. Gottlieb's husband, Allen, would be found to have owned more than fifty percent of the home, since it was acquired during his marriage to her and constitutes marital property.  It would seem that if anyone were found to have owned more than fifty percent of the sale proceeds, it would likely be Mrs. Gottlieb, not the other way around.  In Florida:

All real property held by the parties as tenants
by the entireties, whether acquired prior to or during
the marriage, shall be presumed to be a marital asset.
If, in any case, a party makes a claim to the contrary,

-24-

the burden of proof shall be on the party asserting the claim that the subject property, or some portion thereof, is nonmarital.

Fla. Stat. Ann. § 61.075(6)(a)(2) (West 2015).

Moreover, as elsewhere, spouses' ownership interests in marital assets in Florida are normally considered equal.  See id. § 61.075(1).[9]  Even if not found to be equal, they are apportioned equitably based on a number of factors, including each spouse's contributions to the marriage, whether a spouse gave up a career to raise children, each spouse's economic circumstances, and "[t]he desirability of retaining the marital home as a residence for any dependent child of the marriage, or any other party, when it would be equitable to do so, [when] it is in the best interest of the child or that party."  Id. § 61.075(1)(a)-(j) (listing factors).

With the SEC contending that Mrs. Gottlieb has had no sources of income herself, see SEC Turnover Mem. at 17-18, and with her being the constant caregiver for the couple's profoundly disabled son, see Gottlieb II Decl. ¶ 12 and attached exhibit, it is almost a given that she would be granted a half share, at least, in the marital home.  A spouse's interest in marital property is determined regardless of whether documentation exists to substantiate a claim of ownership.  As one New York appellate

---

[9]     "In distributing the marital assets and liabilities between the parties, the court must begin with the premise that the distribution should be equal, unless there is a justification for an unequal distribution based on all relevant factors . . . ."  Fla. Stat. Ann. § 61.075(1) (West 2015).

court has observed with respect to an appeal raising such an issue:

> The absence of documentation backing up petitioner's claim to a one-half interest in the art works does not defeat her claim. Our Domestic Relations Law provides that personal property acquired by either spouse during a marriage is jointly owned marital property unless the spouses have otherwise agreed. . . .  Whether the husband or the wife brings to or buys property for the marital home, "the only inference which can be drawn, in the absence of affirmative evidence of a different intent, is that all the furniture and furnishings so supplied to the home are so supplied for the joint use, comfort and benefit of both husband and wife, and that neither spouse thereby acquires [exclusive title or ownership]."  That Mr. Sloan may have paid for certain art, sold it, or obtained funds from its sale was only a factor to be weighed by the trier of fact, since either party may make a disposition of joint property with the consent of the co-owner.

Sloan v. Starbare II Partners, L.P., 256 A.D.2d 104, 105, 681 N.Y.S.2d 267, 268 (1st Dep't 1998) (citations omitted).

The same analysis applies even when marital assets are held in the debtor-spouse's name--the opposite of what we have here.  A court considering a turnover application is still required to consider the other spouse's interest. See Cadle Co. v. Satrap, 302 A.D.2d 381, 754 N.Y.S.2d 354 (2d Dep't 2003) (court could not direct husband and wife to turn over their automobile for sale, to satisfy judgment entered solely against husband partially, without first conducting hearing to determine wife's interest in vehicle, even though husband was presumptive owner because his name was listed on title and automobile was acquired during marriage, where wife claimed sole ownership, and, even if she could not prove sole ownership, she still retained one-half interest in vehicle).

-26-

Mrs. Gottlieb submits that her sole ownership or, alternatively, application of the doctrine of tenancy by the entireties must carry the day in persuading the Court that it should order the release of all the funds to her.  She respectfully submits that the Court will never find that, at a bare minimum, her interest in the sale proceeds was anything less than half.  Moreover, nothing the SEC has asserted or could possibly assert legally or factually will change the fact that Mrs. Gottlieb's half share of this marital asset is immune from her husband's creditors.

Thus, even though Mrs. Gottlieb believes there are irrefutable arguments that she should recover all of the restrained funds now, she respectfully submits that the SEC will not be able to advance any credible arguments about why she will be entitled to anything less than half, which makes a release of at least half now absolutely necessary.  Nevertheless, despite all of the above, if the SEC does manage to come up with some argument that casts doubt on the proposition that Mrs. Gottlieb will have to recover at least half, and it gives the Court any pause about whether that will be the case, then it would be reasonable for the Court to consider where the percentage-interest floor for Mrs. Gottlieb lies.  It would be unfathomable to contend that she would end up with as little as a one-percent interest, for example.

In considering this question, Mrs. Gottlieb asks the Court to bear in mind that there is unassailable evidence in the

record that Mr. Gottlieb renounced his own interest in the two
predecessor homes.  <u>See</u> quitclaims deeds attached as exhibits to
the Gottlieb II Decl.  In contrast, there is absolutely no
evidence--and it would strain logic and credibility to suggest
that any will ever be found--that Mrs. Gottlieb ever renounced
her own interest in any of the homes she and Mr. Gottlieb owned,
including the Aventura Lakes property.  Considering the steps she
and her husband took to put their real estate holdings into her
name (again, years before this action was even filed against him)
there is no chance that the proceeds of the sale of the
predecessor properties would not have constituted even a fraction
of the funds used to purchase the Aventura Lakes property.

A one-percent component of funds from the predecessor
homes would seem to be a ridiculously-low estimate but for
purposes of this motion, Mrs. Gottlieb believes the Court can
make the assumption that, considering all the factors and
principles noted above, Mrs. Gottlieb will be found to have at
least that much of an interest in the proceeds of the sale of the
Aventura Lakes home.  If the SEC or the Court has to concede that
point, it is not much of an extension of conclude that she is
entitled to at least half.

D.   Florida's Expansive Homestead Exemption
     Also Protects the Proceeds of the Aventura
     Lakes Home Sale from All Creditors

Even if Florida law did not protect property owned by
tenants by the entirety in this manner, the SEC will still,
eventually, be barred from obtaining any portion of the proceeds

of the Aventura Lakes home sale because Florida's expansive
homestead exemption would protect not only Mrs. Gottlieb's
interest in the home but Mr. Gottlieb's as well.  Under the
homestead exemption, the proceeds of a sale of a home are immune
from the claims of creditors, provided a seller demonstrates an
intent to reinvest the proceeds in a new home, as Mrs. Gottlieb
did here.

> [T]he proceeds of a voluntary sale of a homestead to be
> exempt from the claims of creditors just as the
> homestead itself is exempt if, and only if, the vendor
> shows, by a preponderance of the evidence an abiding
> good faith intention prior to and at the time of the
> sale of the homestead to reinvest the proceeds thereof
> in another homestead within a reasonable time.

Orange Brevard Plumbing & Heating Co. v. La Croix, 137 So.2d 201,
206 (Fla.1962) (quoted in Rossano v. Britesmile, Inc., 919 So. 2d
551, 552 (Fla. Dist. Ct. App. 2005)); see also Suntrust
Bank/Miami, N.A. v. Papadopolous, 740 So.2d 594 (Fla. 3d DCA
1999); Shawzin v. Donald J. Sasser, P.A., 658 So.2d 1148 (Fla.
4th DCA 1995), review denied, 669 So.2d 252 (Fla.1996); Sun First
Nat'l Bank of Orlando v. Gieger, 402 So.2d 428 (Fla. 5th DCA
1981).

"The [SEC] does not dispute that Florida has a very
broad and expansive homestead exemption."  SEC Opp. to Motion for
Partial Release of Funds, dated December 1, 2015, (filed in the
S.D. Fla, prior to that action's transfer to this district) at 5.
It will, however, likely challenge the applicability of the
homestead exemption, factually, by arguing, for example, that the
Gottliebs were not really Florida residents.

Mrs. Gottlieb is confident that the SEC will never be able to establish anything other than that Mr. Gottlieb merely shared an interest in the home, which is not a basis upon which to block either of the Gottliebs from relying on the homestead exemption.  Since the factual disputes raised informally by counsel for the SEC will likely require a trial to resolve, however, Mrs. Gottlieb does not press homestead in this application but it will potentially be an outcome-determinative issue (if the other arguments for release of the funds do not carry the day).

<u>CONCLUSION</u>

Mrs. Gottlieb provided public records supporting the history of ownership of the properties at issue.  The SEC proffered nothing but smoke and the hope of finding something during discovery that might have refuted that evidence but it has failed to do that.  Mrs. Gottlieb provided the sworn affidavit of the lawyer who created the Phyllis J. Gottlieb Living Trust to explain why the trust was created.  The SEC has never even attempted to challenge that explanation.  Mrs. Gottlieb demonstrated that the law is decidedly on the side of a release of her funds.  The SEC argued unconvincingly in its reply papers to the original motion to release (and may well argue again), that it can simply ignore all the protections that Florida (and New York) provide for homes of married couples.  Mrs. Gottlieb will respond again to any such argument in a reply but, she

-30-

submits, she already did so convincingly in her reply to the SEC's opposition to her original motion.

Mrs. Gottlieb, who has been haled into court, is struggling to provide for her family while her husband tries to eke out some type of living to support her and their profoundly-disabled child. They have no income to speak of beyond their social security payments. Their helpless child requires hourly care that requires the stable environment to which he and Mrs. Gottlieb were entitled to have in a homestead, which they still need to purchase. They have been devastated by having to live as nomads for more than five years and, Mrs. Gottlieb respectfully submits, that needs to come to a swift end now that the SEC has failed to substantiate the wildly baseless assertions it made in its heartless effort to take Mrs. Gottlieb's home away from them.

Despite how the Court may feel about Mr. Gottlieb and, largely by virtue of association, Mrs. Gottlieb, there is no dispute that they have an incredibly difficult life as octogenarians (Mr. Gottlieb) and septuagenarians (Mrs. Gottlieb), who struggle each and every day to care for their disabled son in what are very difficult circumstances, created by the unwarranted restraint of Mrs. Gottlieb's funds. For her, an innocent spouse who had absolutely nothing to do with the alleged conduct of her husband that led to the judgment against him, she has recklessly been drawn by the SEC into its dispute with her husband from which she should have been legally insulated. It is she and her son who are suffering the effect of having the proceeds intended

-31-

to use to purchase another homestead property improperly restrained by the SEC, which has steadfastly refused to listen to reason about why it cannot legally lay claim to her home sale proceeds.

It has been more than five years since she and her son were placed in their current limbo, through no fault of either of them, and it would be cruel to drag this process on with a trial on issues that it is abundantly clear now, after discovery, the SEC cannot win. Accordingly, Mrs. Gottlieb respectfully requests the Court to release the funds in the registry and put an end to the misery she and her son have experienced while the SEC has been given an opportunity to prove its baseless assertions. In the alternative, she respectfully requests the Court to release half the restrained funds to allow them to do something-- anything--to remedy the dire circumstances in which they have been thrust, cruelly and improperly, by the SEC's original, unlawful restraining notice.

Dated:      New York, New York
            April 12, 2021

                        Respectfully submitted,

                        _____
                        ALEXANDER E. EISEMANN AE5405
                        Counsel for Interested Party
                           Phyllis Gottlieb
                        20 Vesey Street, Suite 400
                        New York, New York 10007
                        (212) 420-8300

-32-