UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                 Plaintiff,

-against-

ALLEN B. GOTTLIEB, ET AL.,

                 Defendants.

No. 98-CV-2636 (LAP)

OPINION & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

    On January 21, 2003, following a bench trial, the Court entered judgment in favor of the Securities and Exchange Commission ("SEC") requiring Allen Gottlieb to disgorge $2,005,443.54 and to pay an additional $878,333 in civil monetary penalties.  (Final Judgment ("Judgment"), dated Jan. 21, 2003 [dkt. no. 85].)  On July 27, 2015, having received no payments from Mr. Gottlieb in satisfaction of the Judgment for over a decade, the SEC filed a Restraining Notice pursuant to Federal Rule of Civil Procedure 69(a) and New York Civil Practice Law and Rules 5222 restraining First American Title Insurance Company ("FATIC") from transferring funds resulting from the sale of a property at 3234 NE 211 Terrace in Aventura, Florida (the "Aventura Property").  (Restraining Notice, dated June 27, 2015 [dkt. no. 160] at 2.)  On August 20, 2015, the SEC moved to compel FATIC to turn over the assets from the sale of the Aventura Property.  (Mot. to Enforce Judgment, dated Aug.

20, 2013 [dkt. no. 163] at 1-2; see also Mem. Law Supp. Mot. to
Enforce Judgment, dated Aug. 20, 2013 [dkt. no. 166] at 1.)  By
stipulation and order dated September 28, 2017, FATIC agreed to
deposit the $758,177.17 in escrow funds from the sale of the
Aventura Property in the Court's registry.  (Stipulation & Order
of Settlement, dated Sept. 28, 2017 [dkt. no. 292] at 3.)  Thus,
$758,177.17 in proceeds from the sale of the Aventura Property
is currently held in the Court's registry (the "Proceeds").  On
April 12, 2021, Mr. Gottlieb's wife, Phyllis Gottlieb, renewed
her prior motion seeking an order from the Court directing that
some or all of the Proceeds be directed to the Phyllis J.
Gottlieb Living Trust.  (Renewed Notice of Mot. to Release
Funds, dated Apr. 12, 2021 [dkt. no. 319]; Mem. Law Supp. Mot.
to Release Funds ("Gottlieb Release Mem."), dated Apr. 12, 2021
[dkt. no. 324].)  On May 4, 2021, the SEC opposed and moved in
response for at least half of the Proceeds to be released to it.
(SEC Opp'n & Countermotion, dated May 4, 2021 [dkt. no. 330].)
On June 14, 2021, Mrs. Gottlieb filed an omnibus reply and
opposition [dkt. no. 348], which she subsequently amended
(Gottlieb Reply Mem. Supp. Renewed Mot. & Opp'n SEC's Req.
("Gottlieb Reply & Opp'n"), dated June 15, 2021 [dkt. no. 351]).

        For the reasons set forth below, the Court concludes that
neither Mrs. Gottlieb nor the Trust have shown that they are
entitled to the Proceeds and, thus, Mrs. Gottlieb's motion is

denied.  The Court further concludes that the SEC has demonstrated its entitlement to half of the Proceeds and thus grants the SEC's motion in part.

I.  **Background**

On January 15, 2003, the Court entered judgment finding that Allen Gottlieb had violated the anti-fraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.  (Judgment.)  The Court found that Mr. Gottlieb defrauded investors via a "prime bank" fraud scheme in 1993.  Brief for SEC at 4-16, SEC v. Gottlieb, 88 F. App'x 476, 477 (2d Cir. 2004) (No. 03-6035), 2003 WL 24174518.[1]  The Judgment required Mr. Gottlieb to pay disgorgement and prejudgment interest for a total amount of $2,005,443.54, which represented his gains from his fraudulent conduct.  In addition, it imposed injunctive relief and a civil penalty in the amount of $878,333.  In the almost twenty years since the Court entered the Judgment, Mr. Gottlieb has not made a single voluntary payment.  (Contempt Hr'g Tr., dated Aug. 31, 2021 [dkt. no. 377] at 16:8-11.)

---

[1] The Court relies on the SEC's recitation of facts in its August 29, 2003 submission to the Court of Appeals because the transcript of Mr. Gottlieb's trial is no longer available.

Despite failing voluntarily to pay any amount whatsoever since the entry of the Judgment, Mr. Gottlieb and his family have traveled extensively and lived in many places, including Florida, Panama, Brazil, the Bahamas (where Mrs. Gottlieb owns a home valued at nearly two million dollars (Exs. 11 & 13 to White Decl., dated June 10, 2021 [dkt. nos. 347-11, 347-13])), Missouri, and Michigan.  At issue in the present motion is the true ownership of the Proceeds from the sale of the Gottliebs' former home, located at 3234 NE 211 Terrace, Aventura, Florida 33180.  Mrs. Gottlieb purchased the Aventura Property in 2009 with the proceeds from the 1996 and 1998 sales of two other Florida properties through law firm Mavis Collie on behalf of the Cherubs Trust in the Bahamas, for a total of $792,000.  (Ex. 1 to White Decl. dated May 4, 2021 [dkt. no. 331-1] at 1; SEC Resp. Opp'n & Countermotion at 11; Gottlieb Release Mem. at 9-10.)  On the same date that the property was sold, Mavis Collie leased the Aventura Property to Mr. and Mrs. Gottlieb.  (See Ex. 3 to White Decl., dated May 4, 2021 [dkt. no. 331-3].) Approximately seventeen months later, on December 22, 2011, Mavis Collie transferred the Aventura Property to Mrs. Gottlieb for ten dollars of consideration.  (Ex. 4 to White Decl., dated May 4, 2021 [dkt. no. 331-4].)  On July 20, 2015, the Aventura Property, which was then titled solely in the name of the Phyllis J. Gottlieb Living Trust (the "Trust"), was sold to Lior

4

and Dara Cohen (the "Cohens").  (Ex. 5 to White Decl., dated May 4, 2021 [dkt. no. 331-5.)

Mr. and Mrs. Gottlieb jointly owned the two properties that funded the original Aventura Property purchase until Mr. Gottlieb quitclaimed his interest in those properties to Mrs. Gottlieb in 1994 for a recited consideration of ten dollars each.  (Gottlieb Decl., dated Apr. 12, 2021 [dkt. no. 320] at 19-21; Gottlieb Release Mem. at 10.)  Mrs. Gottlieb has no source of income independent of Mr. Gottlieb.  Since their marriage in 1974, Mrs. Gottlieb has never been independently employed or held outside employment.  (Ex. 1 to Tyler Decl., dated Aug. 20, 2015 [dkt. no. 164-1] at 14.)  Instead, throughout their marriage, Mrs. Gottlieb has either cared for their family or worked alongside Mr. Gottlieb.  (Ex. 6 to White Decl., dated May 4, 2021 [dkt. no. 331-6] at ¶¶ 12, 16; see also Contempt Hr'g Tr. at 33:15-35:7.)  Nor has Mrs. Gottlieb inherited any assets or money.  (Ex. 1 to Tyler Decl. at 22-23.) In fact, Mrs. Gottlieb's only alleged means of generating income appears to stem from renovating and decorating the houses she and Mr. Gottlieb lived in, which ostensibly caused the properties to appreciate in value.  (Contempt Hr'g Tr. at 33:15-35:7.)

Mr. Gottlieb was significantly involved in both the purchase and sale of the Aventura Property.  Mr. Gottlieb was

listed as the contact for Mavis Collie and carbon copied on emails relating to the purchase of the Aventura Property. (Ex. 7 to White Decl., dated May 4, 2021 [dkt. no. 331-7].)  Mr. Gottlieb also played the leading role in the attempted sale of the Aventura Property to the Cohens in 2014. (Ex. 8 to White Decl., dated May 4, 2021 [dkt. no. 331-8]; Ex. 2 to Tyler Decl., dated Aug. 20, 2015 [dkt. no. 164-2] at 3.)  Further, nearing the close of the attempted sale in 2014, Mr. Gottlieb directed the Milestone Title Company to include a condition for the title to pass. (Ex. 4 to Tyler Decl., dated Aug. 20, 2015 [dkt. no. 164-4] at 6; Ex. 4 to White Decl.)  Specifically, Mr. Gottlieb "(FOR OBVIOUS REASONS)" wanted the condition to ensure the sale proceeds be successfully wired to an offshore account in Panama or the Bahamas before title would pass. (Ex. 4 to Tyler Decl. at 6.)  Mrs. Gottlieb provides no evidence of her involvement in the purchase and sale of her own property beyond her signature on certain documents (Ex. 8 to White Decl.) and her own declaration (Gottlieb Release Mem. at 12-13).

    In aid of execution on the Judgment, the SEC served a restraining notice on FATIC, the title company involved in the sales transaction.  Consequently, the Proceeds were first held in escrow with FATIC and later deposited in the Court's Registry. (See Mem. Endorsement, dated Sept. 14, 2017 [dkt. no. 290].)  On January 15, 2016, Mrs. Gottlieb moved to intervene in

this action and to have half of the Proceeds paid to her.  (See dkt. nos. 186-189.)  On February 9, 2016, the Court granted Mrs. Gottlieb's motion to intervene and reserved decision on her motion to receive half of the Proceeds.  (Order, dated Feb. 9, 2016 [dkt. no. 195].)  On February 10, 2016, Mrs. Gottlieb filed a memorandum of law and declaration in support of her motion to have half of the Proceeds paid to her.  (Mem. Supp. Gottlieb's Mot. Vacate, dated Feb. 10, 2016 [dkt. no. 200]; Gottlieb Decl.) On April 14, 2016, the Court granted Mrs. Gottlieb's motion to vacate the order granting her intervention.  (Order, dated Apr. 14, 2016 [dkt. no. 220].)  Mrs. Gottlieb thereafter moved to intervene as trustee of the Phyllis J. Gottlieb Living Trust (Mot. Intervene, dated Dec. 6, 2016 [dkt. no. 246]), but she subsequently withdrew that motion (Gottlieb Letter, dated Dec. 27, 2016, [dkt. no. 253]; Notice Withdrawal Mot. Intervene, dated Jan. 10, 2017 [dkt. no. 254]; see also Order, dated Jan. 26, 2017 [dkt. no. 257] at 4.)  By order dated September 7, 2017, the Court held that Mrs. Gottlieb was not precluded from appearing as trustee of the Phyllis J. Gottlieb Living Trust in this action.  (Order, dated Sept. 7, 2017 [dkt. no. 286].)

On April 12, 2021, Mrs. Gottlieb filed a renewed motion, as well as an accompanying memorandum of law and declarations, to release the Proceeds to her.  (Dkt. Nos. 319-325.)  The SEC opposed on May 4, 2021 and moved the Court instead to release at

least half of the Proceeds to it.  (SEC Resp. Opp'n &
Countermotion; White Decl., dated May 4, 2021, [dkt. no. 331].)
Mrs. Gottlieb submitted a reply on June 14, 2021 (dkt. nos. 348-
349), and an amended memorandum of law on June 15, 2021
(Gottlieb Reply & Opp'n).  The parties submitted a final round
of supplemental letters in May 2022.  (See Gottlieb Letter,
dated May 11, 2022 [dkt. no. 416]; SEC Letter, dated May 11,
2022 [dkt. no. 417]; Gottlieb Letter dated May 31, 2022 [dkt.
no. 419].)

## II.  Applicable Law

In federal securities actions, district courts have broad
authority to order all equitable relief necessary under the
circumstances.  See, e.g., SEC v. Manor Nursing Ctrs., Inc., 458
F.2d 1082, 1103 (2d Cir. 1972).  One appropriate remedy is
disgorgement of ill-gotten gains.  See, e.g., SEC v. Cavanagh
(Cavanagh II), 445 F.3d 105, 116-17 (2d Cir. 2006).
Disgorgement is "a distinctly public-regarding remedy, available
only to government entities seeking to enforce explicit
statutory provisions."  FTC v. Bronson Partners, LLC, 654 F.3d
359, 372 (2d Cir. 2011).  Disgorgement is designed to remedy
securities violations by equitably depriving violators of the
fruits of their misdeeds, deterring future fraud, and preventing
unjust enrichment.  See SEC v. Contorinis, 743 F.3d 296, 301,
306 (2d Cir. 2014) (citations omitted).  The effective

enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable.  See, e.g., Manor Nursing Ctrs., 458 F.2d at 1104.  A district court may exercise its broad equitable authority in crafting a disgorgement order to accomplish that goal.  See, e.g., Smith v. SEC (Smith I), 653 F.3d 121, 127 (2d Cir. 2011).

A court may levy a disgorgement order against an innocent third party who: "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds."  SEC v. Cavanagh (Cavanagh I), 155 F.3d 129, 136 (2d Cir. 1998) (citation omitted) (affirming a freeze order on proceeds held in the bank account of the defendant's wife because "[a]llowing her to now claim valid ownership . . . would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds, by the simple procedure of giving stock to friends and relatives"); see also SEC v. Zubkis, No. 97 Civ. 8086 (JGK), 2005 WL 1560489, at *4 (S.D.N.Y. June 30, 2005) (citing Cavanagh I, 155 F.3d at 136) ("The Court may use this broad equitable power to order the turnover of assets nominally held by third parties where the third party lacks a legitimate claim to the assets.").

As to the first Cavanagh factor, funds need not be traced to the proceeds of a fraudulent scheme to be subject to disgorgement.  See, e.g., Commodity Futures Trading Comm'n. v.

Walsh, 618 F.3d 218, 226 n.4 (2d Cir. 2010) (citing SEC v. Byers, No. 08 Civ. 7104 (DC), 2009 WL 33434, at *3 (S.D.N.Y. Jan. 7, 2009) (Chin, J.) (recognizing the challenges of tracing specific funds to illegal activity and stating that defendants should not benefit from commingling their ill-gotten gains with other assets)); see also SEC v. Penn (Penn I), No. 14-CV-581 (VEC), 2021 WL 1226978, at *16 (S.D.N.Y. Mar. 31, 2021) (rejecting argument "that the SEC made no effort to trace the assets to funds that were allegedly misappropriated" and "find[ing] that the money remaining in [the third party]'s account was ill-gotten because it was transferred . . . while the . . . scheme was on-going"), aff'd sub nom. U.S. SEC v. Penn (Penn II), Nos. 21-1348-cv, 21-1352-cv, 2022 WL 2517218, at *3 (2d Cir. July 7, 2022) (affirming district court's holding that funds "were ill-gotten because bank records showed that the relevant funds were the remainder of $10,000 wire transfers from Defendant . . . that were made 'while the . . . scheme was ongoing'") (second alteration in the original).  As to the second Cavanagh factor, there are no explicit guidelines as to what constitutes a legitimate claim.  Walsh, 618 F.3d at 226 (citations omitted).  Yet it is well-established that no legitimate claim exists for property received as a gift, that is without consideration.  See Cavanagh I, 155 F.3d at 137; see also Walsh, 618 F.3d at 226 (citations omitted).

Alternatively, a court may reach assets nominally held by a third party where the defendant is an equitable or joint owner of such assets.  See, e.g., SEC v. I-Cubed Domains, LLC, 664 F. App'x 53, 55 (2d Cir. 2016).  "'[I]f an asset belonging to a relief defendant is, in reality, also an asset of a defendant,' then application of the two-part Cavanagh test is" unnecessary. SEC v. McGinn, Smith & Co. (McGinn II), 98 F. Supp. 3d 506, 522 (N.D.N.Y. 2015) (quoting SEC v. Heden, 51 F. Supp. 2d 296, 299 (S.D.N.Y. 1999)), aff'd sub nom. SEC v. Smith, 646 F. App'x 42 (2d Cir. 2016); see also SEC v. McGinn, Smith & Co., Inc. (McGinn I), 752 F. Supp. 2d 194, 215-16 (N.D.N.Y. 2010), aff'd sub nom. Smith v. SEC, 432 F. App'x 10 (2d Cir. 2011); U.S. SEC v. Ahmed, 343 F. Supp. 3d 16, 34 n.20 (D. Conn. 2018) ("Because . . . the Court concludes that Relief Defendants are nominal owners of Defendant's assets, there is no need to apply the two part Cavanagh test.") (citing I-Cubed Domains, 664 F. App'x at 55 and collecting cases).  Equitable ownership is established when "an individual exercises considerable authority over the assets, acting as though the assets are theirs alone to manage and distribute." See, e.g., SEC v. Smith, 646 F. App'x at 43 (cleaned up).  Other relevant factors include: (1) the length of time the asset had been held; (2) whether the defendant had an interest in and benefitted from the asset; (3) whether the defendant had transferred assets from his name into the asset;

(4) whether the defendant contributed to acquire the asset initially; and (5) whether the defendant ever withdrew any funds from the asset.  See, e.g., McGinn II, 98 F. Supp. 3d at 522. If a defendant is found to be the equitable owner of the asset the burden shifts to the third party asserting ownership to present evidence showing that the third party did in fact own and control the asset.  Ahmed, 343 F. Supp. 3d at 31-32, 31 n.11 (D. Conn. 2018) (citing I-Cubed Domains, 664 F. App'x. at 56-57).

## III. **Discussion**

The principal question before the Court is whether the funds from the sale of the Aventura Property, which at the time of the last sale was owned by a living trust in the name of Mrs. Gottlieb, may be used to satisfy the disgorgement judgment against Mr. Gottlieb.

Mrs. Gottlieb first argues that the judgment against Mr. Gottlieb is not enforceable against the Proceeds because she was the sole owner of the Aventura Property and therefore is the sole owner of the Proceeds.  (Gottlieb Release Mem. at 4-5, 9-10, 20-21.)  In support of this argument, Mrs. Gottlieb relies on the fact that Mr. Gottlieb quitclaimed his interest in the two properties that funded the Aventura Property purchase to her in 1994, which preceded the Judgment against him in the underlying SEC action.  (Id. at 4-5, 9-10, 20-21.)

Alternatively, Petitioner contends that the Aventura Property is protected under Florida's doctrine of tenancy by the entirety.  (Id. at 20-21.)  This theory rests on an imaginary scenario in which the SEC successfully claims that the 1994 transfers were fraudulent conveyances.[2]  (Id. at 20-21.)  In such a world, Mrs. Gottlieb asserts that the remedy is a reversion of the 1994 transfers.  (Id. at 21.)  Thus, returning the two properties and all subsequent transactions to being held as tenancies by the entirety.  (Id. at 21-22.)

Finally, the Petitioner asserts that Florida's homestead exemption shields the proceeds from this Court's authority. (Id. at 28-29.)

    a.   The SEC is Entitled to $395,980 From the Aventura Property Proceeds Pursuant to Cavanagh

Applying the Cavanagh factors, the Court finds that the funds Mrs. Gottlieb used to purchase the Aventura Property are linked to Mr. Gottlieb's misconduct and constitute ill-gotten funds and that the Proceeds are therefore similarly tainted.  As set forth above, Mrs. Gottlieb has never been independently employed or held outside employment (Ex. 1 to Tyler Decl. at 14) and has no other source of income, such as an inheritance or other source of assets or money (id. at 22-23), that could have funded the purchase of the Aventura Property.  Indeed, Mrs.

---

[2] The SEC has not made such a claim.

Gottlieb's only alleged means of generating income is based on the assertion that her home decoration and renovation skills caused the properties to appreciate substantially in value, though the only evidence supporting this assertion is Mr. Gottlieb's ipse dixit.  (Contempt Hr'g Tr. at at 33:15-35:7.)  Because Mrs. Gottlieb does not have any independent source of income or assets, the Court concludes that financially, "all roads lead back to Mr. Gottlieb."  (SEC Resp. Opp'n & Countermotion at 3.)

It is not necessary that the purchase of the Aventura Property be directly linked to Mr. Gottlieb's ill-gotten gains.  See, e.g., Walsh, 618 F.3d at 226 n.4.  Nor is this Court obligated to turn a blind eye to Mr. Gottlieb's strategic asset dissipation which has successfully shielded his ill-gotten gains for nearly twenty years.  See Penn I, 2021 WL 1226978, at *6; SEC v. Solow, 682 F. Supp. 2d 1312, 1314 (S.D. Fla. 2010), aff'd, 396 F. App'x. 635 (11th Cir. 2010) (unpublished).  Here, Mr. Gottlieb transferred his interest in the two properties that funded the Aventura Property purchase to Mrs. Gottlieb in 1994 (Gottlieb Decl. at 19-21; Gottlieb Release Mem. at 10), after he defrauded multiple individuals in 1993, Brief for SEC at 4-16, SEC v. Gottlieb, 88 F. App'x 476, 477 (2d Cir. 2004) (No. 03-6035), 2003 WL 24174518.  This is sufficient to conclude that Mr. Gottlieb's transfer of his interest in the two quitclaimed

14

properties to Mrs. Gottlieb in 1994 constituted the transfer of ill-gotten property.  See Penn II, 2022 WL 2517218, at *6 (affirming district court's holding that funds "were ill-gotten because bank records showed that the relevant funds were the remainder of $10,000 wire transfers from Defendant . . . that were made 'while the . . . scheme was on-going'").  To find otherwise would "provide a roadmap to those looking to shield the fruits of their fraud," SEC v. Merrill, Civil Action No. RDB-18-2844, 2022 WL 541161, at *4 (D. Md. Feb. 22, 2022), by spending down the proceeds of their fraudulent scheme while simultaneously transferring valuable property to relatives and friends.  Such an outcome would be inequitable.  Cf. SEC v. Rosenthal, 426 F. App'x 1, 3 (2d Cir. 2011) (affirming disgorgement order as to third parties and declining to impose a "tracing requirement" that would allow defendants "to escape disgorgement by spending down illicit gains while protecting legitimately obtained assets" because "[d]enying disgorgement in such a situation . . . would be inconsistent with disgorgement's purpose to prevent unjust enrichment") (internal citation and quotation omitted).  Thus, as to the first Cavanagh factor, the Court finds that Mrs. Gottlieb received ill-gotten assets when Mr. Gottlieb quitclaimed his interest in the two properties that funded the Aventura Property purchase to her and that the

portion of the Proceeds that derived from the receipt of those ill-gotten assets is itself ill-gotten.

As to the second Cavanagh factor, Mr. Gottlieb quitclaimed his interest in the two Florida properties to Mrs. Gottlieb in 1994 for a recited consideration of ten dollars each.  (Gottlieb Decl. at 19-21.)  In 2009, the Aventura Lakes property was purchased by and titled in the name of Mavis Collie, Esq., as Trustee of the Cherubs Trust in the Bahamas, for a total of $792,000.  (Ex. 1 to White Decl. dated May 4, 2021 [dkt. no. 331-1] at 1.)  The Petitioner alleges that this purchase was funded by the sale of the two quitclaimed properties.  (Gottlieb Release Mem. at 10.)  Assuming Mr. Gottlieb held no more than a 50% interest in the quitclaimed properties, simple arithmetic shows that Mr. Gottlieb transferred his interest in property with a future value of at least $396,000 for a mere $20.  A spouse "d[oes] not have a legitimate claim to [illegally obtained] property" via the marital estate "while she [i]s married to" a defendant.  Walsh, 618 F.3d at 230 (holding that spouse would only have a legitimate claim to illegally obtained property if a separation agreement by which the spouse provided valuable consideration "served to create a legitimate interest where none existed before").  Because she otherwise had no right to half of the value of each of the quitclaimed properties, the transfer of those properties to Mrs. Gottlieb was a gift to

which Mrs. Gottlieb has no legitimate claim.  Cavanagh I, 155 F.3d at 136.[3]

The Court therefore finds that $395,980 should be released to the SEC pursuant to Cavanagh.

---

[3] Mrs. Gottlieb argues that the fact that "the quitclaim transfers occurred four years prior to the filing of the lawsuit that underlies the SEC's judgment against Mr. Gottlieb, which itself wasn't entered until five more years" and that leaving the property in both their names would have provided "the most effective" protection for the assets under Florida law demonstrates that the transfers were not intended to "hinder the SEC's ability to collect on a future judgment." (Gottlieb Release Mem. at 19-20.)  Setting aside the fact that this is irrelevant under Cavanagh, the Court is deeply suspicious of the proposition that these transfers were innocent estate planning. Mr. Gottlieb was engaged in fraud in 1993, before he transferred the relevant assets to "protect" them for Mrs. Gottlieb and the Gottlieb children (Gottlieb Decl. at ¶¶ 14-15).  That the SEC may not yet have been wise to his misconduct at that time does not mean that Mr. Gottlieb was unaware of the risk that his ill-gotten gains could be taken back from him one way or another and was not incentivized to hinder any potential creditor's recovery.  The Court is also unpersuaded that the purported protections provided by Florida's doctrine of tenancy by the entirety demonstrates anything about the intent behind the transfers.  That Mr. Gottlieb may have shielded his assets poorly does not mean that he and Mrs. Gottlieb did not intend to shield them.  Ultimately, the transfers were for an estate plan that is "curiously one-sided" and "difficult to make sense of" (SEC Letter dated May 11, 2022 at 1) given the myriad other ways to establish an estate plan by which Mr. Gottlieb's legitimate assets would pass seamlessly to Mrs. Gottlieb and vice versa. Though not necessary to render its decision, the Court notes that the transfers "carry with them a circumstantial stench." McGinn II, 98 F. Supp. 3d at 512.  This is particularly true against the backdrop of Mr. Gottlieb's obstructive conduct over the last twenty years.

b.    The SEC is Also Entitled to Some or All of the
Proceeds Because Mr. Gottlieb is the Equitable Owner
of the Proceeds

The Court also concludes that the SEC has adduced
sufficient evidence to show that Mr. Gottlieb is the equitable
owner of the Proceeds.  The record supports the SEC's contention
that Mr. Gottlieb treated the Aventura Property as if it was his
own to manage and sell.  Mr. Gottlieb was listed as the contact
for Mavis Collie and carbon copied on emails relating to the
purchase of the Aventura Lakes Property (Ex. 7 to White Decl.)
and was significantly involved in the attempted sale of the
Aventura Property to the Cohens in 2014 (Ex. 8 to White Decl.).
Further, nearing the close of the attempted sale in 2014, Mr.
Gottlieb directed the Milestone Title Company to include a
condition requiring, "(FOR OBVIOUS REASONS)," that the sale
proceeds be successfully wired to an offshore account in Panama
or the Bahamas before title would pass.  (Ex. 4 to White Decl.;
Ex. 4 to Tyler Decl. at 6.)  Mr. Gottlieb also controlled the
checkbook throughout his marriage to Mrs. Gottlieb, including
while they owned the Aventura Property, and decided which
expenditures were necessary.  (Contempt Hr'g Tr. at 42:17-43:4.)
Rather than provide evidence of Mrs. Gottlieb's involvement in
the control, management, purchase, and sale of her own property,
the Petitioner says "[s]o what?" (Gottlieb Reply & Opp'n at 7-
8), points to the documents she signed (id. at 8), and relies on

18

her own self-serving declaration (Gottlieb Release Mem. at 12-13).  Based on these facts, and Mrs. Gottlieb's failure to refute them, the Court concludes that Mr. Gottlieb clearly "exercise[d] considerable authority over the" Aventura Property. SEC v. Smith, 646 F. App'x at 43 (cleaned up).

The other relevant factors include: (1) the length of time the asset had been held; (2) whether the defendant had an interest in and benefitted from the asset; (3) whether the defendant had transferred assets from his name into the asset; (4) whether the defendant contributed to acquire the asset initially; and (5) whether the defendant ever withdrew any funds from the asset.  McGinn II, 98 F. Supp. 3d at 522.

As to the first factor, Mr. Gottlieb played a significant role in the purchase of the Aventura Property (Ex. 7 to White Decl.) and controlled the sale of the Aventura Property (Ex. 8 to White Decl.).  As set forth above, Mr. Gottlieb also controlled the family checkbook (Contempt Hr'g Tr. at 42:17-43:4), raising an inference that he controlled the funds used to purchase the Aventura Property.  In other words, Mr. Gottlieb controlled the asset the entire time it was held and controlled the funds used to purchase the Aventura Property prior to its purchase.

As to the second factor, Mr. Gottlieb has clearly derived benefits from the Aventura property, despite the Petitioner and

Mr. Gottlieb's contention that he has "used all [his] and everybody's money out since 2015."  (Contempt Hr'g Tr. at 105:16-19; White Decl. at 2-3.)  There is ample evidence that benefits flow to Mr. Gottlieb from the assets of his wife, including the Aventura Property.  He would have been able to purchase and "live in our home" if the Proceeds were available.  (Contempt Hr'g Tr. at 72:16-73:4 (emphasis added).)  Mr. Gottlieb, in other words, lived in a home worth close to one million dollars, and would have been able to purchase a similar home to live in via the Proceeds, while he spent "[his] and everybody's money" on other things, like trips to Brazil and Panama and Mrs. Gottlieb's waterfront home in the Bahamas.

Furthermore, "[w]hether the defendant's motive is direct economic profit [or] psychic satisfaction from benefitting a loved one . . . [a defendant] has . . . secured a benefit thereby."  Contorinis, 743 F.3d at 303.  Mr. Gottlieb's purported motivation in 1994 for quitclaiming the two properties that funded the Aventura Property purchase to Mrs. Gottlieb was "to make sure that [the Gottlieb's] son Jesse, [the Gottlieb's] unborn daughter and [Mrs. Gottlieb] would be cared for should something happen to" Mr. Gottlieb and "to protect these assets for [the Gottlieb's] children and [Mrs. Gottlieb]."  (Gottlieb Decl. at ¶¶ 14-15.)  Mr. Gottlieb thus "secured [the] benefit"

of "psychic satisfaction from benefitting [his] loved one[s]."
Contorinis, 743 F.3d at 303.

As to the third factor, as set forth above Mr. Gottlieb
quitclaimed his interest in the two Florida properties that
funded the Aventura Property purchase.  Thus, there is no
question that at least half of the value of the Aventura
Property derived from assets Mr. Gottlieb transferred from his
name.  As to the other half, Mrs. Gottlieb, as previously
discussed, has never been employed and has no demonstrable
source of income or assets.  In the absence of any explanation
for how Mrs. Gottlieb contributed any funds to the family
coffers, the Court concludes that Mr. Gottlieb ultimately
provided all of the financial backing for the Aventura Property
purchase.  The Court finds that the fourth factor, whether Mr.
Gottlieb contributed to acquire the asset initially, weighs in
favor of finding that Mr. Gottlieb is the equitable owner of the
Proceeds for similar reasons.

As to the fifth factor, there is no evidence that Mr.
Gottlieb withdrew funds from the asset, though the Court notes
that having the use of the Aventura Property permitted Mr.
Gottlieb the freedom to spend liquid assets on other things,
provided him a place to live, and that Mr. Gottlieb intended to
direct the Proceeds towards the purchase of a new home.

Considering Mr. Gottlieb's control over the assets at issue and weighing the relevant factors, the Court finds that Mr. Gottlieb was the equitable owner of the Aventura Property and is the equitable owner of the Proceeds.  Thus the burden shifts to Mrs. Gottlieb to show that the "assets legitimately belong to" her, I-Cubed Domains, 664 F. App'x. at 57 n.3, such as by showing that "the asset in question was purchased or funded with [her] untainted funds, as opposed to Mr. [Gottlieb's]" or that the "asset was a gift from a non-party."  Ahmed, 343 F. Supp. 3d at 34-35.

The Court will permit the parties to brief and present further evidence on this point.  The Court will only entertain evidence and arguments regarding the dollar value of Mrs. Gottlieb's direct contributions to the family and to the value of the Aventura Property and the two properties that funded the Aventura Property purchase.  For example, the Court will consider evidence of what a professional performing a similar service to those provided by Mrs. Gottlieb would have earned for similar outcomes.  The Court will not entertain further arguments regarding a per se 50% interest via Mrs. Gottlieb's marriage to Mr. Gottlieb or similar arguments

based on presumptive rights via her relationship or purported
ownership status.[4]

    c.   <u>The Court May Reach Mrs. Gottlieb's Assets Otherwise
       Protected by State Law</u>

Mrs. Gottlieb argues that the proceeds are shielded from
collection because of Florida's tenancy by the entirety
doctrine. (Gottlieb Release Mem. at 5-6.) Mrs. Gottlieb
similarly argues that the Proceeds are protected under Florida's
constitutional homestead exemption. (<u>Id.</u> at 8.)

Initially, Mrs. Gottlieb's argument regarding Florida's
tenancy by the entirety doctrine is misguided. The SEC does not
argue that the quitclaim transfers were fraudulent conveyances
that should be reversed. Rather, the SEC argues that
Mr. Gottlieb was an equitable owner of the Aventura Property and
therefore is an equitable owner of the Proceeds. Under the
facts here, it is irrelevant that Mr. and Mrs. Gottlieb might
have owned property subject to Florida's tenancy by the entirety
doctrine if they did not engage in their "curiously one-sided"
(SEC Letter dated May 11, 2022 at 1) estate planning or would
hypothetically own the relevant property in this form if the

_____

[4] The Court, and not a jury, will decide these issues "in light of
the overwhelming case law . . . in which district courts have
used their equitable power in the context of securities
enforcement actions to order the turnover of assets nominally
held by third parties" without a jury trial. <u>Ahmed</u>, 343 F.
Supp. 3d at 24.

conveyances were unwound.  The Court has held that Mr. Gottlieb
was an equitable owner, but that does not mean that any property
has been deemed to be owned as a tenancy by the entirety.
Florida law governing tenancy by the entirety is simply
inapplicable and irrelevant under the facts here.

Furthermore, the Court has broad equitable authority to
disregard state law where necessary to ensure the vitality of
federal securities laws.  While the Court may be guided by state
law, the enforcement of a federal court's disgorgement order may
reach assets otherwise protected by state law.  See Badgley v.
Santacroce, 800 F.2d 33, 38 (2d Cir. 1986); Manor Nursing Ctrs.,
458 F.2d at 1103 ("Once the equity jurisdiction of the district
court has been properly invoked by a showing of a securities law
violation, the court possesses the necessary power to fashion an
appropriate remedy."); see also Solow, 682 F. Supp. 2d at 1325-
26.  This authority extends to orders for equitable relief
against a third party if that third party has received ill-
gotten funds or does not have a legitimate claim to those funds.
See e.g., Cavanagh I, 155 F.3d at 136-37 (affirming the district
court's preliminary injunction that froze proceeds from the sale
of stock which were connected to the fraud at issue and
deposited into the bank account of the defendant's wife);
Merrill, 2022 WL 541161, at *4 (noting the dearth of cases
holding "that a federal court is bound by state law in

determining which property may be disgorged from a relief
defendant as an equitable remedy for violations of the federal
securities laws" and declining to apply state law governing
"tenants by the entireties" where such a "ruling . . . would
effectively provide a roadmap to those looking to shield the
fruits of their fraud"); SEC v. Yun, 208 F. Supp. 2d 1279, 1283-
84 (M.D. Fla. 2002) ("[T]his is not a Florida state court, and,
as such, it is not bound by Florida law. . . . This Court, in
its discretion, will not be guided by state law where its effect
is to make a liable party judgment proof.") (citations omitted);
SEC v. Huffman, 996 F.2d 800, 803 (5th Cir. 1993) (holding that
disgorgement is not a "debt" and, thus, defendants could not
avail themselves of a state law exemption under the Federal Debt
Collection Procedures Act); SEC v. AMX, Int'l, Inc., 872 F.
Supp. 1541, 1544-45 (N.D. Tex. 1994) (declining to take
homestead exemption into account); SEC v. Musella, 818 F. Supp.
600, 602 (S.D.N.Y. 1993) (holding exemptions from attachment
under New York law did not alter a person's duty to pay under a
disgorgement order); Pension Benefit Guar. Corp. v. Ouimet
Corp., 711 F.2d 1085, 1093 (1st Cir. 1983) (ignoring state law
limitations on alter ego theory in ERISA context).

        For example, in SEC v. Hickey, 322 F.3d 1123 (9th Cir.
2003), the Court of Appeals for the Ninth Circuit held that the
district court's broad equitable powers to reach third parties

25

to effect orders in securities fraud enforcement actions allowed
it to freeze a corporation's assets, even when there was no
alter ego relationship under California law.  The <u>Hickey</u> court
stated that:

> We do not think that state law limitations on the
> alter ego theory or doctrine are necessarily
> controlling in determining the permitted scope of
> remedial orders under federal regulatory statutes.
> Instead, federal courts have inherent equitable
> authority to issue a variety of ancillary relief
> measures in actions brought by the SEC to enforce the
> federal securities laws.

322 F.3d at 1131 (internal citations and quotations omitted).
In a similar case, the defendant's "only source of income and
support [wa]s what he receive[d] from his wife, who [wa]s
supporting her children, her husband and herself with the
transferred assets because she [wa]s a full-time mother who
ha[d] not been employed outside the home since [the children's]
birth."  <u>Solow</u>, 682 F. Supp. 2d at 1326 (internal quotations
omitted).  The <u>Solow</u> court reasoned that in such circumstances,
the "ability to ignore state law limitations and exemptions
exists so that state law cannot defeat or limit the scope of
remedial orders under federal law."  <u>Id.</u>

So too here.  Permitting Mrs. Gottlieb to take refuge in
state law to bar the Court from reaching assets that Mr.
Gottlieb equitably owns would permit Mr. Gottlieb to continue to
flout his obligations under the Judgment and undermine the

26

enforcement of the federal securities laws.  The Court therefore
declines to consider Mrs. Gottlieb's arguments regarding
Florida's homestead protections and, to the extent even
applicable under the facts here, her arguments regarding
Florida's tenancy by the entirety doctrine.

## IV.  **Conclusion**

In closing, the Court "will not be fooled by tears, nor
misled by the obvious appeal to its sensitivity for" vulnerable
disabled adults.  SEC v. Antar, 831 F. Supp. 380, 381 (D.N.J.
1993).  Mr. Gottlieb defrauded other individuals to accumulate
substantial wealth.  His family, including Mrs. Gottlieb,
benefited from his illegal conduct and as a result have enjoyed
a quality of life that others in similar situations could only
dream of.[5]  However "faultless" they may or may not have been in
Mr. Gottlieb's conduct or his contumacious refusal to accept
responsibility for his misdeeds or return the proceeds of his

---

[5] Mrs. Gottlieb owns a large four-bedroom home in the Bahamas on
the waterfront with a private beach, dock, and boat lift, a
swimming pool, and a three-bedroom guest cottage.  (Exs. 11 & 13
to White Decl.)  The Gottlieb family stayed in the "vacation
spot in Brazil" with "the waters and everything" for a purported
business trip and paid rent in excess of $48,000 for the year.
(Contempt Hr'g Tr. at 20:7-21:17.)  The Gottlieb family also had
access to accounts through which over $650,000 flowed from 2008
to 2021. (Contempt Hr'g Tr. at 94:19-95:2.)  Mr. and Mrs.
Gottlieb's disabled son, Jesse, had access to his own horses for
therapy purposes, which the Gottlieb family were able to move
from Florida to the Bahamas and back again.  (Gottlieb Decl. at
¶¶ 23, 34.)  In short, the record overflows with evidence of the
Gottlieb family's comparatively comfortable situation.

unlawful and fraudulent conduct over approximately twenty years, this money belonged to Mr. Gottlieb's victims.  Mr. Gottlieb's family is not entitled to and "should not be allowed to retain funds that are the product of [Mr. Gottlieb's] fraud."  Antar, 831 F. Supp. at 402; Contorinis, 743 F.3d at 306-07 ("[D]isgorgement is imposed not to punish, but to ensure illegal actions do not yield unwarranted enrichment even to innocent parties.").  "As between [them] and the victims of fraud, equity dictates that the rights of the victims should control."  Antar, 831 F. Supp. at 402-03.  The "truth [must] be told and judged whatever the result.  The law demands no more and no less than that."  Id. at 381.

For the reasons set forth above, Mrs. Gottlieb's Motion for the Release of Funds (Gottlieb Mot. to Release Funds., [dkt. no. 319]) is DENIED, and the SEC's Countermotion for the release of half the funds to it (SEC Resp. Opp'n & Countermotion, [dkt. no. 330]) is GRANTED.  The parties shall provide the Court with a proposed briefing schedule concerning the remaining Proceeds consistent with this order.

SO ORDERED.

Dated:    New York, New York
          February 7, 2023

_Loretta A. Preska_
LORETTA A. PRESKA
Senior United States District Judge

28